NEEDHAM et al. Appellants,

v.

THE PROVIDENT BANK, Appellee.

[Cite as *Needham v. The Provident Bank* (1996), 110 Ohio App.3d 817.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68630.

Decided May 6, 1996.

818

*Michael Westerhaus,* for appellants.

*Berick, Pearlman & Mills Co., L.P.A., Paul J. Singerman* and *Jennifer L. Soda,* for appellee.

HARPER, Judge.

Plaintiffs-appellants, William J. Needham and Lucy M. Needham ("appellants," collectively, or "W. Needham" and "L. Needham," individually), appeal from the granting of summary judgment in favor of defendant-appellee, The Provident Bank, by the Court of Common Pleas of Cuyahoga County. Appellants submit that genuine issues of material fact remain for litigation regarding their lender liability claims against Provident. A careful review of the record compels affirmance.

## I

W. Needham's uncle was the founder and original owner of Communication Systems and Services Company ("CSSC"), an Ohio corporation. CSSC sold, installed and maintained a variety of telephone, sound and voice communication systems. W. Needham became CSSC's president in 1983 when he purchased fifty percent of the corporation's shares of stock. He became the sole shareholder in 1990 upon the purchase of the remaining fifty percent shares of stock from Hank Dickey.

W. Needham formed Communication Financing Corporation ("CFC") in early 1989 to act as CSSC's financing arm. This structure enabled CSSC to offer lease financing and compete for customers seeking larger communication systems. CFC first purchased leases from CSSC in March 1989.

W. Needham first sought business financing from Provident in August 1988 when CSSC's then commercial lender, American National Bank, could not meet

CSSC's financial needs. Provident granted CSSC three forms of financial assistance—a demand line of credit for CSSC,[1] an installment loan for CSSC, and a line of credit for CFC.

## A

W. Needham applied for CSSC's demand line of credit on or about October 19, 1988. The bank granted a $150,000 revolving line of credit for working capital. Advances, determined by monthly borrowing base reports, were limited to eighty percent of eligible accounts receivable and fifty percent of inventory. W. Needham, as CSSC's president, executed a revolving promissory note and signed a security agreement on October 19, 1988. Pursuant to the note, CSSC was required to pay principal on demand and make monthly interest payments beginning on November 30, 1988. The security agreement granted Provident a substantial security interest in CSSC's assets.

Appellants and CFC, after its formation, guaranteed CSSC's demand line of credit. Appellants' guaranty was secured by a mortgage on their personal residence. CFC guaranteed the line of credit by executing a secured unlimited guaranty on December 12, 1989. This guaranty was secured by granting Provident a substantial security interest in CFC's assets.

Provident increased CSSC's demand line of credit to $200,000 in late December 1989, subject to the same terms and conditions as the pre-existing line of credit. W. Needham, as CSSC's president, signed a revolving promissory note and security agreement for the increased line of credit on or about January 3, 1990. The payment terms of the note and the security interests granted by the agreement were the same as those contained in the October 1989 documents.

W. Needham signed a new guaranty agreement on January 3, 1990, and L. Needham signed one on August 27, 1990. Appellants also granted Provident a junior mortgage on their personal residence in the amount of the increased credit limit, $200,000. CFC likewise remained a guarantor on the $200,000 demand line of credit, the guaranty secured by CFC's assets.

Provident informed appellants through a letter dated December 28, 1989 of the increased credit limit. The bank also informed appellants through the letter that the credit was subject to review for continuation by October 31, 1990. Appellants were also advised therein to establish monthly borrowing reports and submit periodic financial reports. Both of these reports were to be in a format specified by Provident.

---

1. Appellants' proposition that this line of credit was not a "demand" line of credit is discussed below.

A few years later, in March 1992, W. Needham requested and received a loan advance under the demand line of credit. The loan advance increased the principal amount outstanding to the maximum available amount of $200,000. Since the outstanding principal balance of the demand line of credit thereafter remained at $200,000, no new advances were available under the line of credit after March 4, 1992.

Meanwhile, W. Needham closed CSSC on March 3, 1992 because of financial difficulties. CSSC's sales manager, Robert G. Snyder, convinced W. Needham to meet with Nikitas D. Makris to discuss a possible sale of CSSC. Makris was the principal of Makris Brothers Management Company, Inc. An agreement was reached during a meeting held at Makris's home on March 8, 1992. The agreement provided that W. Needham would sell all of CSSC's shares of stock to Snyder and Makris Brothers Management Company for $75,000. CSSC reopened for business on March 9, 1992. The stock sale transaction was completed on March 16, 1992.[2]

Regarding the $200,000 owed to Provident under the CSSC demand line of credit, the obligation was restructured under a promissory note dated October 6, 1992. Makris and Snyder signed the note as CSSC's president and secretary respectively. This note required six installments of principal of $20,000, plus interest, payable monthly, commencing November 10, 1992. A final payment was required on May 10, 1992 in an amount sufficient to satisfy the note in full. Makris personally guaranteed the October 1992 note on October 6, 1992 and Snyder on August 4, 1992.

In December 1992, Provident enforced the terms of the October 1992 note following CSSC's failure to pay any of the monthly installments, both principal and interest. The bank obtained money judgments against CSSC, Makris and Snyder for $200,000, plus interest, in the Court of Common Pleas of Cuyahoga County, case No. CV–244730. The bank took no action against appellants under their guarantees to collect the sums owed it by CSSC.

B

W. Needham, on CSSC's behalf, applied for a $100,000 loan from Provident in August 1990. W. Needham wanted the $100,000 to satisfy CSSC's payment obligations under an agreement with Hank Dickey. The satisfaction would then permit W. Needham to purchase the shares of CSSC's stock owned by Dickey,

---

2. Though the purchase agreement called for W. Needham to receive $25,000 of the $75,000 purchase price at the closing, Makris and Snyder were in default at the time of the lawsuit, having paid only $17,600 to W. Needham. The parties agreed to share the expenses of, and possible recovery from, the instant action in exchange for W. Needham's promise not to enforce the $75,000 obligation. Snyder was later removed as a party from the agreement.

enabling W. Needham to become the sole shareholder of the company. Provident approved the loan request on August 21, 1990.

W. Needham signed a promissory note as CSSC's president on August 27, 1990. The terms of the note required CSSC to make thirty-five monthly installments of $2,780, plus interest, commencing September 30, 1990, and one final payment on August 27, 1993 in an amount sufficient to pay the note in full. The note was secured by the same CSSC personal property assets that secured the corporation's demand line of credit and by a mortgage against CSSC's business premises located at 4750 State Road, Cleveland, Ohio, and the adjacent property at 4746 State Road.

Appellants and CFC guaranteed the installment loan. CFC secured its guaranty of the loan by a second lien position (behind Provident's first lien position in respect of CFC's line of credit, discussed below) against CFC's personal property assets. Provident's security interest stemmed from a security agreement dated August 27, 1990, signed by W. Needham as CFC's president.

C

As discussed above, W. Needham formed CFC to act as a financing source for CSSC customers who wished to lease communication equipment. W. Needham applied to Provident for a line of credit to facilitate CFC's purchase of CSSC's equipment leases. The bank approved a $150,000 revolving line of credit on or about March 16, 1989. CFC's $150,000 line of credit was secured by a first priority blanket lien and security interest in substantially all of CFC's personal property assets.

W. Needham, as CFC's president, signed a revolving promissory note on March 6, 1989 that required CFC to pay interest monthly, commencing March 31, 1989, and the principal on October 31, 1989. The promissory note also required CFC to make principal reductions if the value of the collateral, as determined by the borrowing base reports, fell below the outstanding loan balance.

Appellants guaranteed CFC's line of credit. The guaranties were secured by a junior mortgage against their personal residence. Though CSSC also guaranteed the line of credit, Provident released the guaranty pursuant to W. Needham's request after Makris and Snyder purchased CSSC.

Provident renewed and extended CFC's line of credit to November 30, 1989 upon the promissory note's expiration on October 31, 1989. The thirty-day renewal occurred because CFC's initial financial statements for the seven-month period prior to September 30, 1989 were not yet available for Provident's review.

The line of credit was renewed and extended to April 30, 1991 under November 30, 1989, April 30, 1990 and May 31, 1990 revolving promissory notes. Appellants

reaffirmed their guaranty for CFC's line of credit by executing a mortgage dated November 30, 1989.

CFC's line of credit was in default from mid–1991 to March 1992. The default resulted because the value of CFC's collateral, as reflected in the borrowing base reports, was less than the outstanding loan balance and CFC was unable to make the necessary principal reductions to bring the loan into compliance.

Provident, on or about February 20, 1991, requested that appellants find replacement financing as a result of CFC's default under its line of credit. The bank's position was that the request was premised solely on CFC's default. Appellants' position was that Provident required that they find replacement financing for CSSC as well. Specifically, W. Needham maintained that he was told "to find another bank; that they [the bank] did not want his business anymore." He also claimed that bank personnel told him "he was too small; that they only wanted loans of at least $750,000, because their administrative cost was the same for a smaller loan as a larger loan."

Although Provident repeated its request to appellants, the bank never expressly stated when appellants had to procure the replacement financing. Appellants admit that Provident neither demanded payment on any loan nor took any action to enforce its rights under any loan document, security agreement, or guaranty. Moreover, Provident continued to work with appellants while appellants sought replacement financing, an unsuccessful undertaking.

## D

As previously stated, W. Needham closed CSSC on March 3, 1992. According to Provident, it was unaware of CSSC's closure and the agreement with Snyder and Makris for the purchase of CSSC until March 10, 1992 when W. Needham telephoned Ken Demko, CSSC's loan officer at the bank.

Demko, a second loan officer named Roy Lanctot, W. Needham, Makris and Snyder met the following day to discuss the stock sale transfer and its effect on CSSC and appellants. Provident, as CSSC's principal lender, was asked at the meeting to increase CSSC's demand line of credit to between $450,000 and $500,000.

Demko and Snyder met for a second time on March 17, 1992. Snyder informed Demko about the stock sale transaction that was completed on the previous day. Demko requested copies of the stock sale agreement and other financial information at this meeting. Snyder also emphasized that he and Makris wanted to continue a banking relationship with Provident. As part of this continuing relationship, the parties discussed whether Provident would provide an additional $250,000 to be secured by real estate. Demko advised Snyder that Provident

would consider lending additional funds to CSSC if Snyder and Makris injected $100,000 of capital into the corporation.

On March 26, 1992, Demko notified Snyder that Provident was not willing to finance CSSC any further because of the bank's unfamiliarity with both Makris and Snyder and the extent of CSSC's loans. CSSC's new owners responded that they would inject $250,000 of working capital into the business. Demko, in turn, recommended that CSSC continue its search for replacement financing. However, the bank would grant CSSC a reasonable time period to seek the financing after Snyder and Makris injected the capital. Demko told Snyder that Provident would release appellants from their CSSC loan guarantees, including a release of the mortgages securing the guaranties, upon the infusion of capital.

Provident subsequently learned that CSSC had been experiencing serious financial and operational hardships for months prior to the stock transfer. CSSC's account manager, service department manager and a top salesperson, in fact, resigned to form their own communications business. The account manager, John Benko, related at deposition that an inadequate management plan and his doubts about CSSC's future prompted his departure. Unbeknownst to Provident, CSSC's delinquent accounts at the time of the stock transfer closing were as follows: past due trade debt in the amount of $129,570.38, IRS payroll taxes in the amount of $34,832.72, Ohio sales tax in the amount of $18,167.22, city and state withholding taxes in the amount of $2,411.90, workers' compensation in the amount of $4,618.06, and penalties and interest in an unspecified amount. Additionally, Provident learned on May 28, 1992 that CSSC was subjected to a $25,800 IRS tax levy. Demko conferred with Snyder about the levy, and was assured that CSSC would pay the $25,800 in full within thirty days.

Provident thereafter requested that Makris and Snyder personally guarantee CSSC's loans because of their inability to acquire replacement financing. Demko requested their signatures on personal guaranties in a letter dated June 2, 1992. Demko, in the letter, also repeated an earlier request for certain financial information, including personal financial statements and the most recent financial statement of CSSC.

Demko, Makris, Snyder and Lewis M. Goodman, Provident's regional vice president, met on June 19, 1992 to discuss CSSC's loans. Makris and Snyder did not yet deliver the financial information requested in the June 2, 1992 letter to the bank. Snyder and Makris explained that the search for replacement financing was delayed because current financial statements for the corporation were not available. They also refused to sign personal guaranties for CSSC's loans with Provident since a number of problems surfaced that threatened the corporation's survival.

Another meeting was held on July 8, 1992 with Goodman, Demko, Makris and Snyder in attendance. The bank was not only seeking personal guaranties from Makris and Snyder, but it also wanted an explanation as to the dramatic change in CSSC's financial condition from November 30, 1991 to March 31, 1992. Recent financial statements reflected that CSSC's accounts payable had increased from $52,113 to $187,802.02, and its retained earnings fell from $123,195 to ($33,969), during this period. At a September 15, 1992 meeting between Goodman, Demko and Snyder, Snyder was advised that Provident had not received CSSC's June 1992 financial statement or the personal financial statements of Makris and Snyder.

Demko sent a certified letter to CSSC in care of Snyder on September 23, 1992, in which Provident set forth various unsatisfied demands. The change in CSSC's financial condition as of March 1992 and Makris's and Snyder's persistent refusal to sign personal guaranties led to the bank's decision to send the letter.

Provident subsequently agreed to restructure CSSC's demand line of credit under an installment note. The terms of the note required six monthly principal installments of $20,000, plus interest, with a balloon payment at maturity. The bank's conditions were communicated to CSSC in a letter dated October 7, 1992.

Makris, Snyder, and CSSC, however, made no payments to Provident after October 7, 1992 with respect to either CSSC's restructured demand line of credit or the installment loan. Regarding the demand line of credit, CSSC made none of the principal or interest payments. As to the installment loan, CSSC made the August 27, 1992 installment on September 21, 1992, but made no further payments.

Pertaining to Provident's release of appellants' personal guaranties on CSSC's obligations, W. Needham requested the release in connection with the sale of CSSC. W. Needham alleged that the bank conditioned the release upon four events, to wit, (1) the meeting of the bank's lending requirements by Makris and Snyder, (2) Makris's and Snyder's personal guaranties of CSSC's obligations, (3) Provident's "looking over" Makris and Snyder, and (4) Provident's consenting to Makris and Snyder as new owners of CSSC. A memorandum prepared by Demko at the time of W. Needham's request indicated that appellants' personal guaranties would be released when Makris and Snyder injected $250,000 of capital into CSSC and upon the redocumentation of the loan arrangements between CSSC and Provident.

Snyder executed and delivered an unconditional guaranty to Provident on or about August 4, 1992. Makris executed and delivered his guaranty on or about October 7, 1992 in conjunction with the restructuring of CSSC's demand line of credit. However, none of the other conditions for appellants' release of their personal guaranties were met by the appropriate parties. Notwithstanding the

nonrelease of appellants' personal guaranties, Provident never took any action against appellants to enforce the guaranties.

CSSC filed for bankruptcy in June 1993 under Chapter 11 of the United States Bankruptcy Code. The bankruptcy action was later converted to one under Chapter 7 of the United States Bankruptcy Code, thereby causing the liquidation of CSSC.

## II

On August 26, 1993, appellants filed a complaint in the trial court premised upon the deteriorated business relationship with Provident. They alleged that Provident's early 1991 request that W. Needham obtain replacement financing and its refusal to release appellants' personal guaranties "violated the obligations to deal in good faith and to act in a commercially reasonable manner that exists between defendant bank and plaintiff, as set forth in R.C. Secs. 1302.01 and 1301.09." Appellants also alleged a violation of R.C. 1301.14, the statute which requires good faith in the acceleration of payment or performance.

Provident, in addition to filing an answer and other responsive pleadings, filed a motion for summary judgment with supporting materials on November 21, 1994. Following the filing of appellants' brief in opposition to the motion, and Provident's reply brief, the trial court granted summary judgment in favor of Provident on February 1, 1994.

## III

Appellants outline their challenge to the trial court's grant of summary judgment as four issues. The first issue is whether the note executed by W. Needham in connection with CSSC's demand line of credit was a demand note. The second and third issues are whether a "good faith" standard applies to the parties' banking relationship and whether Provident's actions violated the standard. The final issue is whether Provident's newspaper advertisement created a fiduciary relationship between the parties, thereby requiring a higher standard of responsibility. Appellants argue that, at a minimum, genuine issues of material fact exist as to these issues, thus demonstrating the trial court's erroneous grant of summary judgment.

The granting of summary judgment is only appropriate if there is no genuine issue as to any material fact, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. *Toledo's Great E. Shoppers City, Inc. v. Abde's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St.3d 198, 201, 24 OBR 426, 428–429, 494 N.E.2d 1101, 1103–1104; Civ.R. 56(C). An order granting summary judgment will, therefore, be upheld only where the

record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law when construing the evidence most strongly in favor of the nonmoving party. *Johnson v. New London* (1988), 36 Ohio St.3d 60, 61, 521 N.E.2d 793, 794–795; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 273–274.

The factual dispute must be material, *i.e.*, the facts involved must have the potential to affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211–212. Moreover, the issue to be tried must be genuine, and one that allows reasonable minds to return a verdict in favor of the nonmoving party. *Id.*, 477 U.S. at 248–252, 106 S.Ct. at 2510–2512, 91 L.Ed.2d at 211–214. See, also, *Manofsky v. Goodyear Tire & Rubber Co.* (1990), 69 Ohio App.3d 663, 591 N.E.2d 752.

Summary judgment is a procedural device which is used to terminate litigation and, therefore, must be awarded with caution with all doubts resolved in favor of the nonmoving party. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 333, 587 N.E.2d 825, 831–832; see, also, *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138, 139–140. However, it "forces the nonmoving party to produce evidence on any issue for which that party bears the production at trial." *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099, citing *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

■ As to the first issue presented by appellants, appellants admit, on the one hand, that they executed a demand note with Provident. For example, in their appellate brief, appellants state the following:

(1) "[I]n October 1988 he [W. Needham] was given a $150,000 secured line of credit for CSSC, with no fixed due date * * *. Appellant did not understand why he was given a note payable 'upon demand' * * *."

(2) "In January 1990 the original $150,000 line of credit * * * was rewritten and increased to $200,000, * * * with no fixed due date * * *."

(3) "Although the action of 'demanding that someone find another bank' may sound harmless, in the context of the present case it is deadly, because of the use of demand notes for long-term financing * * *."

(4) "[A]ppellant [W. Needham] went to Appellee [Provident] looking [for] long term financing * * *. Instead he was given short term loans and loans due on demand * * *."

However, appellants then submit that the note was not a "true demand note," but one that required Provident to act in good faith in either terminating the banking relationship or demanding payment on the note. Appellants concede

nonetheless that Provident never demanded payment on the demand line of credit. Therefore, whether the promissory note was a demand note is irrelevant to whether Provident acted in bad faith as to its payment because Provident never demanded or accelerated payment of the note.

■ Regarding appellants' claim that Provident owed them a fiduciary duty, W. Needham explained that he sought financing from Provident after reading advertisements, including the following, which was published in Craine's Cleveland Business:

"Provident Bank is committed to providing individualized commercial banking services. You'll enjoy product development that is sensitive to enhancing your operating and business planning goals. Lines of credit, corporate expansion loans, lease financing, cash management services and interest rate risk management are only several of the innovative financial services available. We're certain you'll find Provident Bank one of the most aggressive, responsive corporate banking institutions in the Cleveland area. Let us arrange a capabilities presentation at our Eaton Center headquarters. The lunch is on us. We know you'll find a place for Provident Bank as your 'Partner in Business.' "

Appellants submit that this advertisement, combined with their "unique" commercial transactions with the bank, established that Provident owed it the duty of care fitting a fiduciary relationship.

■ Generally, the relationship between a creditor and debtor is not a fiduciary one, but is one governed by freedom of contract. *Stone v. Davis* (1981), 66 Ohio St.2d 74, 78, 20 O.O.3d 64, 66–67, 419 N.E.2d 1094, 1097–1098, certiorari denied *sub nom. Cardinal Fed. S. & L. Assn. v. Davis* (1981), 454 U.S. 1081, 102 S.Ct. 634, 70 L.Ed.2d 614. A fiduciary relationship exists when a "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Id.*, quoting *In re Termination of Employment* (1974), 40 Ohio St.2d 107, 115, 69 O.O.2d 512, 517, 321 N.E.2d 603, 608–609. Such a relationship arises out of an informal relationship where "both parties understand that a special trust or confidence has been reposed." *Stone*, 66 Ohio St.2d at 78, 20 O.O.3d at 67, 419 N.E.2d at 1098.

In *Stone*, the savings and loan broached the subject of mortgage insurance as part of the application process. A fiduciary relationship was found to exist between the savings and loan and the debtors when it then failed to advise the debtors that they had to procure the insurance themselves. *Id.* at 78–79, 20 O.O.3d at 66–67, 419 N.E.2d at 1097–1098.

The Supreme Court of Ohio subsequently issued its opinion in *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363. The court found that

reasonable minds could only conclude that Bank One was not under a duty to disclose the details of a fee arrangement because the bank had no special relationship of trust and confidence with the Blons. *Stone* was distinguishable insofar as it dealt with the area of loan processing, and not the negotiation of the terms and conditions of a mortgage loan in an arm's-length transaction. *Id.* at 102, 519 N.E.2d at 368. The *Blon* court thus held:

"A creditor and consumer stand at arm's length in negotiating the terms and conditions of a consumer loan, and absent an understanding by both parties that a special trust and confidence has been reposed in the creditor, the creditor has no duty to disclose to the consumer the existence and details of a finder's fee or similar arrangement with a credit arranger." *Id.*, paragraph two of the syllabus. See *Goralsky v. Taylor* (1991), 59 Ohio St.3d 197, 571 N.E.2d 720; *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320.

Since *Blon,* appellate courts are reluctant to find a fiduciary relationship in existence between creditors and debtors. For the most part, even if a creditor gives business advice, the business relationship does not convert to a fiduciary relationship. See *Umbaugh; Craggett v. Adell Ins. Agency* (1993), 92 Ohio App.3d 443, 635 N.E.2d 1326; *Warren v. Percy Wilson Mtge. & Fin. Corp.* (1984), 15 Ohio App.3d 48, 15 OBR 76, 472 N.E.2d 364; *Lynch v. Dial Fin. Co. of Ohio No. 1, Inc.* (1995), 101 Ohio App.3d 742, 656 N.E.2d 714; *Kohus v. Fifth Third Bank Corp.* (Nov. 27, 1991), Hamilton App. No. C–900306, unreported, 1991 WL 249975; *Houston v. Bank One, Akron, N.A.* (Oct. 18, 1990), Cuyahoga App. No. 57316, unreported; *Shaner v. United States* (C.A.6, 1992), 976 F.2d 990, certiorari denied (1993), 507 U.S. 1051, 113 S.Ct. 1944, 123 L.Ed.2d 650; *Eyerman v. Mary Kay Cosmetics, Inc.* (C.A.6, 1992), 967 F.2d 213.

In *Umbaugh,* a farmer and a farmers' cooperative executed an open-ended mortgage agreement. The cooperative advised and counseled the farmer on occasion with regard to the farming operation. The farmer successfully asserted a claim against the cooperative at some point during their relationship.

The Supreme Court of Ohio reversed. The court explained:

"The only basis for the finding of the fiduciary relationship was the association's giving of advice and counseling to the Scotts relevant to their loans and business activities. But here the offering and giving of advice was insufficient to create a fiduciary relationship. While the advice was given in a congenial atmosphere and in a sincere effort to help the Scotts prosper, nevertheless, the advice was given by an institutional lender in a commercial context in which the parties dealt at arms length, each protecting his own interest. * * *

"[N]either party had, nor could have had, a reasonable expectation that the creditor would act solely or primarily on behalf of the debtor. * * * Also, the

rendering of advice by the creditor to the debtors does not transform the business relationship into a fiduciary relationship. The borrowers could not reasonably believe that the association was acting in a fiduciary capacity." *Id.,* 58 Ohio St.2d at 287, 12 O.O.3d at 282, 390 N.E.2d at 323.

■ Finally, a fiduciary relationship cannot be unilaterally created by one party in the creditor/debtor relationship. *Craggett,* 92 Ohio App.3d at 451, 635 N.E.2d at 1331–1332. Rather, the debtor asserting such a relationship must demonstrate that the creditor understood that the debtor was placing special trust or confidence in the relationship. *Id.;* see *Blon; Umbaugh.*

In the present case, appellants fail to demonstrate that a fiduciary relationship existed with Provident. As stated above, the fiduciary relationship cannot be premised upon unilateral beliefs or expectations.

With regard to the newspaper advertisement, appellants assert that Provident became its "Partner in Business" once the bank agreed to finance the businesses. They argue that "trust" is implicit in such a relationship, thereby establishing a fiduciary relationship. However, one cannot reasonably construe the advertisement as an open invitation to the public to enter into a partnership with the bank. The advertisement merely solicited business by informing readers about the financial services available at Provident and was not an offer to enter into a partnership. See *Alligood v. Procter & Gamble Co.* (1991), 72 Ohio App.3d 309, 594 N.E.2d 668; *Ehrlich v. Willis Music Co.* (1952), 93 Ohio App. 246, 51 O.O. 8, 113 N.E.2d 252.

■ Moreover, appellants assert nothing more than unilateral beliefs or expectations. They refer to "[t]he combination of short term and demand notes, coupled with security interests in all Appellant's business assets and Appellants' personal real estate" and the "unique type of financing for CFC, whereby CFC's leases were assigned to Appellee" as creating a reasonable expectation that Provident would work with them to promote appellants' best interests. However, the type of financing referred to by appellants and the loan documents signed by them, including the security agreements and guaranties, are commonly used in commercial loan transactions, and appellants offer no evidence to the contrary. If appellants were overwhelmed with the amount of documents, and failed to read them, as they suggest, their failure to do so cannot be used to impose a fiduciary duty on Provident. See *Haller v. Borror Corp.* (1990), 50 Ohio St.3d 10, 552 N.E.2d 207; *Kroeger v. Brody* (1936), 130 Ohio St. 559, 5 O.O. 210, 200 N.E. 836; *McAdams v. McAdams* (1909), 80 Ohio St. 232, 88 N.E. 542; *Cuyahoga Cty. Hosp. v. Price* (1989), 64 Ohio App.3d 410, 581 N.E.2d 1125.

In light of this court's conclusion that a fiduciary relationship did not exist between appellants and Provident, the primary issue is whether the termination

of the banking relationship between Provident and appellants and/or Provident's refusal to release appellants from their guaranties resulted from the bank's failure to act in good faith. Appellants essentially argue that Provident acted in bad faith when the bank instructed them to seek replacement financing, an instruction which resulted in the sale of CSSC and caused intolerable emotional distress to W. Needham.[3] Provident also exhibited bad faith, according to appellant, when it refused to release the guaranties.

The source of a lender's duty of good faith and fair dealing is found in the Uniform Commercial Code (as codified in R.C. 1301.01 *et seq.*), and the Restatement of the Law 2d, Contracts.[4] The relevant sections of the Ohio Revised Code are (1) R.C. 1301.09 (Section 1–203 of the UCC), which provides that every contract falling within the UCC "imposes an obligation of good faith in its performance or enforcement," and (2) R.C. 1301.01 (Section 1–201[19] of the UCC), which defines "good faith" as "honesty in fact in the conduct or transaction concerned."[5] In order to find whether Provident failed to act in good faith in its dealings with appellants, this court must determine whether any alleged acts were "commercially unjustifiable." See *Master Chemical Corp. v. Inkrott* (1990), 55 Ohio St.3d 23, 28, 563 N.E.2d 26, 31; *Appley v. West* (C.A.7, 1987), 832 F.2d 1021, 1031; R.C. 1301.01(S). Compare *G.F.D. Enterprises, Inc. v. Nye* (1988), 37 Ohio St.3d 205, 210, 525 N.E.2d 10, 15, fn. 12 ("good faith" under R.C. 1301.01[S] does not mean that a party acts in a "commercially reasonable" manner).

A line of cases dealing with a bank's alleged bad faith acts focuses on lenders who, without adequate notice to the debtors, terminate current credit facilities and accelerate existing obligations. One of the most famous of these cases is *K.M.C. Co., Inc. v. Irving Trust Co.* (C.A.6, 1985), 757 F.2d 752, wherein the court found demand provisions to be a type of acceleration clause which required good faith performance in demanding repayment. Ohio courts, however, uniformly reject the holding in *K.M.C.*, and instead find that a lender does not

---

3. Though appellants' complaint and brief on appeal contain a vague reference to this emotional distress, appellants did not set forth a claim for negligent or intentional infliction of emotional distress in their complaint. Appellants moreover did not advance this claim in the trial court.

4. Restatement of the Law 2d, Contracts (1979), Section 205, states, in reference to the applicable UCC provisions, "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

5. R.C. 1301.14 (Section 1–208 of the UCC) provides that where a term in an instrument provides that a party may accelerate a payment or performance "at will" or "when he deems himself insecure," the holder may exercise these rights "only if he in good faith believes that the prospect of payment or performance is impaired." However, Provident never demanded or accelerated payment on any note executed by appellants. This code section is thus irrelevant to this appeal.

act in "bad faith" when it decides to enforce its contract rights. See, *e.g.*, *Metro. Life Ins. Co. v. Triskett Illinois, Inc.* (1994), 97 Ohio App.3d 228, 646 N.E.2d 528; *Gaul v. Olympia Fitness Ctr., Inc.* (1993), 88 Ohio App.3d 310, 623 N.E.2d 1281; *Bennco Liquidating Co. v. Ameritrust* (1993), 86 Ohio App.3d 646, 621 N.E.2d 760; *First Fed. S. & L. Assn. of Akron v. Cheton & Rabe* (1989), 57 Ohio App.3d 137, 569 N.E.2d 298; *Third Natl. Bank & Trust Co. v. Sinder* (June 18, 1987), Montgomery App. No. 9995, unreported, 1987 WL 12965. But, see, *Cardinal Fed. S. & L. Assn. v. Michaels Bldg. Co.* (May 8, 1991), Summit App. No. 14521, unreported, 1991 WL 76870.

In *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting* (C.A.7, 1990), 908 F.2d 1351, the court found that when a bank is not contractually obligated to advance additional funds under an otherwise sufficient line of credit, its refusal to do so does not amount to "bad faith." *Id.* at 1358. The *Kham* court explained as follows:

"Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' Although courts often refer to the obligation of good faith that exists in every contract relation, e.g., UCC [Section] 1–201; *Jordan v. Duff & Phelps*, Inc. 815 F.2d 429, 438 (7th Cir.1987), this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.

" \* \* \*

"Although Bank's decision left Debtor scratching for other sources of credit, Bank did not create Debtor's need for funds, and it was not contractually obliged to satisfy its customer's desires. The Bank was entitled to advance its own interests, and it did not need to put the interests of Debtor and Debtor's other creditors first. To the extent *K.M.C., Inc. v. Irving Trust Co.*, 757 F.2d 752, 759–63 (6th Cir.1986), holds that a bank must loan more money or give more advance notice of termination than its contract requires, we respectfully disagree." *Id.* at 1357–1358. See *Fasolino Foods Co. v. Banca Nazionale del Lavoro* (C.A.2, 1992), 961 F.2d 1052, 1056–1057; *Gaul*, 88 Ohio App.3d at 320, 623 N.E.2d at 1288.

In the present case, assuming *arguendo* that *K.M.C.* is valid legal authority in the state of Ohio, appellants fail to establish its application to the facts of their case. Regarding CSSC, the record shows that during the relevant time period, Provident neither terminated the current credit facilities nor re-

quired the corporation to pay off its existing obligations. Appellants, as stated above, fully admit that Provident never demanded payment on the loans to CSSC. Rather, the demand line of credit remained unaffected, and Provident continued to advance funds under it even after the bank requested that W. Needham find alternative financing.

According to W. Needham, CFC's line of credit was canceled and "no more funds [were] available for leases." However, the express terms of the CFC line of credit loan documents demonstrated that the line of credit matured on April 30, 1991, and Provident was not contractually obligated to extend the credit beyond this date. Provident provided funds up until April 30, 1991, and W. Needham admitted that Provident never demanded payment of the sums owing under the CFC line of credit. Provident, in fact, extended the maturity date for payment of the sums four times, with the last date being April 30, 1992.

The facts of the pending case reveal that while appellants owned CSSC and CFC, Provident neither terminated the credit facilities of either CSSC or CFC nor demanded or accelerated payment under the lines of credit. Thus, no genuine issue of material fact presents itself regarding Provident's alleged bad faith termination or acceleration of the lines of credit.

Finally, *K.M.C.* (assuming *arguendo* its applicability) also dealt with an adequate notice requirement. Provident, however, provided ample notice to appellants regarding alternative financing when it directed W. Needham to seek alternative financing nearly a year before Makris and Snyder purchased CSSC, a period during which Provident continued to finance CSSC and CFC.

■ One of the two remaining acts on behalf of Provident which could form a basis for appellants' claim of bad faith is the act of directing W. Needham to find alternative financing. W. Needham testified as follows in this regard:

"Q. * * * But the bottom line is, that's all the bank did between * * * February 20, 1991, and March 16th 1992. It repeatedly told you to find another bank?

"A. Yes."

Pursuant to *Kham & Nate's Shoes, Gaul, Bennco,* and the other previously cited cases discussing a lender's decision to enforce its contract rights, this court finds that appellants failed to produce any evidence that Provident acted in bad faith in directing W. Needham to find replacement financing.

Appellants submit that Provident did not merely request that W. Needham find replacement financing. According to them, the request for replacement financing "meant that Plaintiff [W. Needham] [must] prepare to pay off all his demand and short term loans or face default and foreclosure." This charge is unfounded, as

the record firmly establishes that Provident never took any action to enforce payment, nor did it threaten default and/or foreclosure.

Appellants also suggest that when W. Needham sought replacement financing, the institutions approached did not believe that Provident had merely requested replacement financing. Rather, appellants submit that the institutions refused to extend credit because they believed that appellants were in default on their obligations to Provident, or otherwise based their refusal upon the alleged unique financing structure of CFC. However, appellants fail to produce dispositive evidence on this position, *e.g.*, through deposition testimony or affidavits of banking personnel from the banks that refused to finance CSSC and CFC. W. Needham also demonstrated through his deposition testimony that he failed to follow up on loan requests to at least two other institutions.

Appellants next submit that Provident acted in bad faith when it refused to release them from their obligations as guarantors of CSSC's loans. In order to find that Provident acted in bad faith in this regard, this court must determine whether the act of refusing to release appellants as guarantors was "commercially unjustified." See *Master Chemical Corp.*

Appellants asked to be released from their obligations under their personal guaranties of CSSC's debts in connection with the sale of the corporation to Makris and Snyder. Demko acknowledged the request and, according to W. Needham, replied that the release would occur upon satisfaction of four conditions. First, Makris and Snyder were to meet Provident's lending requirements. Second, Makris and Snyder were to execute personal guaranties of CSSC's obligations. Third, Provident was to "look over" the new owners. Finally, Provident was to consent to the new owners. According to both W. Needham and Demko, the only condition met was that Makris and Snyder personally guaranteed CSSC's obligations. Under these circumstances, the record fails to show that Provident was commercially unjustified in not releasing appellants from their obligations.[6]

Appellants suggest that Provident never intended to release them from the guaranties despite its promise to do so and that this intent amounts to bad faith. There is, however, no evidence in support of this suggestion. Additionally, since the four conditions were not met, and W. Needham admits to this failure, the record still establishes that Provident was not commercially unjustified in not releasing appellants under the guaranties.

---

6. As repeatedly stated, there is no indication that Provident ever took any action against appellants to enforce the guaranties.

In conclusion, our review of the record fails to disclose the existence of a genuine issue of material fact with regard to appellant's claim that Provident breached its duty to act in good faith in the administration and continuation of loans to CSSC and CFC. Provident, as correctly determined by the trial court, was thus entitled to judgment as a matter of law.

Appellants' assignment of error is overruled.

*Judgment affirmed.*

KARPINSKI and MCMONAGLE, JJ., concur.