[Cite as *Yontz v. State Farm Ins. Co.*, 2026-Ohio-1800.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

Verna L. Yontz, et al.                    Court of Appeals No.  {39}H-25-011

    Appellants                    Trial Court No.  CVC 20210489

v.

State Farm Insurance Company              **DECISION AND JUDGMENT**

    Appellee                    Decided: May 15, 2026

* * * * *

Mark A. Stuckey, for appellants.

Michael A. Paglia, for appellee.

* * * * *

**OSOWIK, J.**

{¶ 1} Plaintiffs-appellants Verna Yontz, Sabrena Hackathorn, Rachel Herrington, Johnny Hackathorn, and Rustan Herrington (collectively "plaintiffs") appeal the February 26, 2025 judgment of the Huron County Court of Common Pleas, granting summary judgment in favor of defendant-appellee State Farm Insurance Co. ("State Farm").  For the following reasons, we affirm the trial court's judgment.

## I.  Background

{¶ 2} This case involves underinsured/uninsured motorist ("UM/UIM") claims arising out of a motor vehicle accident on July 2, 2019, in Norwalk Township.  The

details of the accident are undisputed—non-party Pamela Sapp struck a vehicle driven by Sabrena Hackathorn with Rachel Herrington and Verna Yontz in the vehicle as passengers. The vehicle was owned by Sabrena's husband, Johnny Hackathorn. All three women were injured in the accident and taken to Fisher-Titus Medical Center for treatment.

{¶ 3} Following the accident, Ms. Hackathorn, Ms. Herrington, and Ms. Yontz each signed a settlement and release agreement with Ms. Sapp and her insurance, Dairyland. According to the agreements, Ms. Hackathorn would receive $25,000, Ms. Herrington would receive $10,000, and Ms. Yontz would receive $7,000. In exchange for the payments, each agreement stated, in relevant part, that the signatory

> does hereby and for her heirs, executors, administrators, successors, and assigns releases, acquits and forever discharges Odell Holbrook, Pamela Sapp, and Dairyland their agents, servants, employees, successors, heirs, executors, administrators, insurers and all other persons, corporations, firms, associations, or partnerships of and for any claims, actions, causes of actions, demands, rights, damage, costs, loss of services or consortium, expenses, compensation whatsoever, which the undersigned, her heirs, issue, and/or assigns may now have or which may hereinafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries, property damage, and the consequences thereof resulting or to result from the accident, casualty, or event which occurred on or about the 2nd day of July, 2019 in the County of Huron, State of Ohio, in the Township of Norwalk, at the intersection of State Route 601 and State Route 61.
>
> * * *
>
> The undersigned agrees to indemnify and hold harmless Odell Holbrook, Pamela Sapp, and Dairyland, their agents, servants, employees, successors, heirs, executors, administrators, insurers and all other persons, corporations, firms, associations, or partnerships in regard to any and all claims of the undersigned, her assigns, servants, successors, heirs, executors, administrators, medical providers or any other persons or entities acting on her behalf, which may be asserted now or in the future and are the

2.

(sic) related to the accident, casualty, or event which occurred on or about the 2nd day of July, 2019 in the County of Huron, State of Ohio, in the Township of Norwalk, at the intersection of State Route 601 and State Route 61. This shall include but is not limited to Medicare, Medicaid, the United States Government, and U.S. Department of Veterans Affairs.

It is further understood and agreed that this release includes all claims asserted by or which could have been asserted by the undersigned as a result of the July 2, 2019 accident….

An addendum to the release additionally added the following relevant conditions:

### III.    <u>Hold Harmless and Indemnity Agreement</u>

Additionally, as further consideration of the parties' willingness to settle the claim referenced in the RELEASE OF ALL CLAIMS, and to induce said settlement, Claimant (and Claimant's attorney if applicable) agree(s) by and on behalf of myself (ourselves) and my (our) heirs, executors, administrators, and assigns, that I (we) will hold harmless and indemnify each and every released party, all of their subsidiaries, affiliates, parent companies, divisions, contractors, employees, servants, agents, officers, directors and legal representatives, and hold free and harmless, from and against any and all losses, claims, demands, cause or causes of action or judgments of every kind and character, which may or could be brought for attorneys' fees, contribution or indemnity, any and all statutory contractual or common law subrogation claims or liens, including but not limited to, all health insurance liens, workers' compensation subrogation liens, Medicare or Medicaid liens, Social Security disability liens, Federal State or local governmental liens.

{¶ 4} Days later, on June 30, 2021, plaintiffs initiated this case against State Farm, as well as other defendant-insurance companies who were dismissed prior to the trial court's summary judgment decision and are not parties to this appeal. The Hackathorns were named as insureds, and the plaintiffs sought claims under their State Farm UM/UIM policy. Specifically, Ms. Hackathorn, Ms. Herrington, and Ms. Yontz sought claims relating to their injuries and treatment; Mr. Herrington and Mr. Hackathorn sought loss of

3.

consortium claims; and Mr. Hackathorn also sought a claim for property damages for his vehicle.

{¶ 5} On June 6, 2022, State Farm filed a motion for summary judgment as to its insureds, Sabrena and Johnny Hackathorn, arguing that (1) there were no genuine issues as to any material facts that the Hackathorns were not entitled to UM/UIM benefits under the State Farm policy because Ms. Hackathorn settled with Ms. Sapp without State Farm's "written consent"; and (2) Mr. Hackathorn's property damage claim failed because plaintiffs destroyed State Farm's subrogation rights by failing to name Ms. Sapp as a party defendant and the statute of limitations to name her had expired.

{¶ 6} While the motion was pending, plaintiffs voluntarily dismissed the other co-defendant insurance companies and kept only the case against State Farm active. In response, State Farm moved for leave to file a motion for summary judgment as to all remaining plaintiffs. In its second motion for summary judgment, State Farm made three arguments that (1) there were no genuine issues as to any material facts that Ms. Yontz and Ms. Herrington were not entitled to UM/UIM benefits under the Hackathorn's State Farm policy because they admittedly breached the policy by settling without State Farm's "written consent"; (2) under the State Farm policy, Ms. Yontz and Ms. Herrington were precluded from UM/UIM benefits since they had UIM coverage for this accident under their own policies; and (3) the plaintiffs had no requisite expert support to recover on their claims.

4.

**{¶ 7}** To support its arguments, State Farm cited to three provisions of the Hackathorns' policy. The first, which was cited to in both motions, included the requirement that any settlements must be consented to by State Farm in writing:

**Consent to Settlement**

The *insured* must inform *us* of a settlement offer, if any, proposed by or on behalf of the owner or driver of the *uninsured motor vehicle*, and the *insured* must request *our written consent* to accept such settlement offer.

If *we*:

1.    *consent in writing*, then the *insured* may accept such settlement offer.

2.    inform the *insured in writing* that *we* do not consent, then the *insured* may not accept such settlement offer and:

    a. *we* will make payment to the *insured* in an amount equal to such settlement offer. This payment is considered a payment made by or on behalf of the owner or driver of the *uninsured motor vehicle*; and

    b. any recovery from or on behalf of the owner or driver of the *uninsured motor vehicle* shall first be used to prepay *us*.

\* \* \*

**Exclusions**

THERE IS NO COVERAGE:

1.    FOR AN *INSURED* IF THAT *INSURED* OR HIS OR HER PERSONAL REPRESENTATIVE, WITHOUT *OUR WRITTEN CONSENT*, SETTLES WITH ANY PERSON OR ORGANIZATION WHO IS OR MAY BE HELD LEGALLY LIABLE FOR THE *BODILY INJURY*

\* \* \*

No legal action may be brought against us relating to Uninsured Motor Vehicle Coverage for any cause of action that rises out of or is related to that coverage until there has been full compliance with its **Consent to Settlement** and **Deciding Fault and Amount** provisions.

(Emphasis in State Farm brief.)

**{¶ 8}** The second, which was cited only in the second motion, defined who qualified as an "insured" for UM/UIM benefits:

UNINSURED MOTOR VEHICLE COVERAGE

\* \* \*

Insured means:

1.  you;

2.  resident relatives;

3.  any other person who is not insured (or uninsured motor vehicle coverage under another vehicle policy) while occupying:

    a. your car;

    b. a newly acquired car; or

    c. a temporary substitute car.

**{¶ 9}** The last, which was only cited in the first motion, explained State Farm's subrogation rights:

13. **Our Right to Recover Our Payments**

    Death, Dismemberment and Loss of Sight Coverage and Loss of Earnings Coverage payments are not recoverable by us. Under all other coverages, the following apply:

a.  **Subrogation**

    (1)     If we are obligated under this policy to make payment to or for a person or organization who has a legal right to collection from another person or organization, then we will be subrogated to that right to the extent of our payment.

    (2)     The person or organization to or for whom we make payment must help us recover our payments by:

            (a)     doing nothing to impair that legal right;

            (b)     holding all rights of recovery against all liable parties in trust for our benefit;

            (c)     doing whatever is necessary to protect and preserve our rights to recover;

6.

(d)     executing any documents we may need to assert that legal right; and

(e)     taking legal action through our representatives when we ask.

{¶ 10} State Farm additionally cited to letters sent between the parties, contending that the only communication it received on the matter from plaintiffs' counsel was a letter to State Farm on March 5, 2021, letting it know that Ms. Sapp had authority to offer her insurance policy limits of $25,000 / $50,000, and that this offer was "contingent" on "an agreement" as to how this money was allocated between Ms. Hackathorn, Ms. Herrington, Ms. Yontz, and non-party minor, J.H. (who had been in Ms. Sapp's vehicle), and that since J.H. was a minor, his portion required Probate Court approval. State Farm noted that it responded on March 7, 2021, requesting "proof of the policy limits of all tortfeasors and proof of all applicable limits of liability have been offered." According to State Farm, plaintiffs never responded or provided the requested information, and most importantly, never got State Farm's written consent to accept an offer.

{¶ 11} On February 26, 2025, the trial court granted summary judgment in favor of State Farm, finding that plaintiffs' claims failed as a matter of law due to the settlements entered into by Ms. Hackathorn, Ms. Herrington, and Ms. Yontz without State Farm's written consent. The trial court additionally found that Mr. Hackathorn's claim of property damage also failed as a matter of law because plaintiffs had destroyed State Farm's subrogation rights by failing to name Ms. Sapp as a party-defendant and allowing the statute of limitations to expire.

7.

**{¶ 12}** Plaintiffs appealed the summary judgment decision. They present two assignments of error for our review:

**First Assignment of Error:**

> The Trial Court erred in granting Appellee's Motion for Summary Judgment as to all Appellants contrary to law.

**Second Assignment of Error:[1]**

> The Trial Court erred by granting Appellee's Motion for Summary Judgment as to all Appellants against the manifest weight of the evidence.

## II. Law and Analysis

**{¶ 13}** Because the parties do not distinguish between the two assignments of error, we shall address both assignments of error together.

**{¶ 14}** We review de novo the trial court's summary judgment determination, employing the same Civ.R. 56 standard as trial courts. *Chalmers v. HCR ManorCare, Inc.*, 2017-Ohio-5678, ¶ 21 (6th Dist.); *Hudson v. Petrosurance, Inc.*, 2010-Ohio-4505, ¶ 29.

**{¶ 15}** Civ.R. 56 provides that summary judgment may be granted only when it is demonstrated: "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the

---

[1] Plaintiffs also list to their second assignment of error as "Appellants claim that the Trial Court erred in granting Appellee's Motion for Summary Judgment as to an amount of damages as there are genuine issues of material fact as to the amount of damages." Seeing that plaintiffs do not make any arguments specifically about damages in their briefing, and State Farm quotes the manifest weight language when referencing the assignments of error, we will address the manifest weight argument as the Second Assignment of Error.

8.

motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 66 (1978); Civ.R. 56(C).

{¶ 16} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988), paragraph one of the syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79 (1984). The opposing party must do so using "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact…." Civ.R. 56(C). "A material fact is one that would affect the outcome of the suit under the applicable substantive law." *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304 (6th Dist. 1999), citing *Needham v. Provident Bank*, 110 Ohio App.3d 817, 827 (8th Dist. 1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence would allow reasonable minds to find for the nonmoving party. *Needham* at 827.

{¶ 17} To begin our analysis, we look to the Supreme Court of Ohio's decision in *Ferrando v. Auto-Owners Mut. Ins. Co.*, 2002-Ohio-7217. There, the Supreme Court held that "[w]hen an insurer's denial of underinsured motorist coverage is premised on the insured's breach of a consent-to-settle or other subrogation-related provision in a

9.

policy of insurance, the insurer is relieved of the obligation to provide coverage if it is prejudiced by the failure to protect its subrogation rights." *Id*. at paragraph two of the syllabus. The first step in this analysis is to determine whether the provision actually was breached. *See Erdmann v. Kobacher Co.*, 2003-Ohio-5677, ¶ 29 (6th Dist.), citing *Ferrando* at ¶ 91. "If not, no further inquiry is required and UIM coverage must be provided." *Id*. citing *Ferrando* at ¶ 91. "If the subrogation-related clause was breached, the second step is to determine whether the UIM insurer was prejudiced." *Id*. "An insured's breach of such a provision is presumed prejudicial to the insurer absent evidence to the contrary." *Ferrando* at paragraph two of the syllabus.

{¶ 18} The Hackathorns' State Farm policy required that the "insured must inform us of a settlement offer, if any, proposed by or on behalf of the owner or driver of the uninsured motor vehicle, and the insured must request our written consent to accept such settlement offer." The policy further stated that there is no coverage, "FOR AN INSURED IF THAT INSURED OR HIS OR HER PERSONAL REPRESENTATIVE, WITHOUT OUR WRITTEN CONSENT, SETTLES WITH ANY PERSON OR ORGANIZATION WHO IS OR MAY BE HELD LEGALLY LIABLE FOR THE BODILY INJURY." Furthermore, "[n]o legal action may be brought against us relating to Uninsured Motor Vehicle Coverage for any cause of action that rises out of or is related to that coverage until there has been full compliance with its Consent to Settlement and Deciding Fault and Amount provisions."

10.

{¶ 19} To determine whether this policy was breached, we must review the record. On December 17, 2019, State Farm sent plaintiffs' counsel a letter addressing subrogation plans which read, in part:

> The purpose of this letter is to advise you that we intend to pursue a subrogation or reimbursement claim in compliance with all applicable statutes for the jurisdiction for amounts paid under our Insured's coverage's. To date, we have issued the following payments on our Insured's behalf:
>
> Medical Payments Coverage in the amount of $1,000.00
>
> If damages occurred, we will pursue our Insured's property damage directly with the other insurance carrier. Please advise us if our Insured receives their deductible directly. We are not responsible for any fees for recovery of property damages.
>
> Since we intend to collect our own interest directly, you are not authorized by State Farm to make claim for, collect, negotiate, or otherwise attempt in any way to recover our subrogated interest. We must respectfully decline your assistance (at this time) and request that you do nothing to impair our subrogation rights. We will not be responsible for any cost, expense, obligation, or attorney fees incurred.
>
> Please do not take any action which may jeopardize our subrogation rights. If State Farm retains an attorney to represent our interests, you will be advised.

{¶ 20} On December 22, 2019, plaintiff's counsel responded with a letter acknowledging State Farm's subrogation rights and asking for clarification of the scope the statement that "[i]f damages occurred, we will pursue our Insured's property damage directly with the other insurance carrier."  Counsel explained that "Johnny and Sabrena's 2009 Chrysler Town & Country Van was a total loss. Further, Sabrena's diamond wedding ring was damaged."  He inquired whether State Farm's statement regarding damages meant that it was pursuing the claim for the van and the ring.

11.

{¶ 21} On March 5, 2021, plaintiffs' counsel sent another letter to State Farm which stated,

> I have been negotiating with Sara M. Valentine, Esq. who is the attorney representing Miss Sapp and Miss Holbrook. She advised that her clients had a policy in force through Viking Insurance Company of Wisconsin with limits of $25,000.00 per person and $50,000.00 per accident. She has authority to offer the policy limit of $50,000.00; however, there has to be an agreement as to what amount of money each of my clients and a fourth person, who is a minor, will receive from the $50,000.00.
>
> The offer is contingent upon the claimants, and/or Paul Horst on behalf of [J.H.], and/or Pamela Sapp on behalf of Caden Snyder executing a full release, handling all known and unknown liens, and a Probate Court appearance and approval for all minor complaints.
>
> I am also in discussions with Paul Horst regarding how much he is requesting on behalf of [J.H.], a minor.
>
> The individual claim of Sabrena and Verna currently exceed Viking's policy limit of $25,000.00. Rachel's claim m[a]y not exceed the policy limit. Accordingly, please consider this a request for their collective pursuit of the underinsured portion of the policy of your insured, Johnny Hackathorn.
>
> I also invite you to join in discussions with Attorney Valentine and me as to the allocation of the money remaining in the per accident limit of the Viking policy. Perhaps an allocation strategy could alleviate Rachel's claim toward the underinsured portion of your insured[']s policy.

{¶ 22} State Farm responded on March 7, 2021, requesting "proof of the policy limits of all tortfeasors and proof that all applicable limits of liability have been offered." According to State Farm, plaintiffs never replied to this request.

{¶ 23} In June 2021, Ms. Hackathorn, Ms. Herrington, and Ms. Yontz each signed a settlement and release agreement with Ms. Sapp. Shortly after, plaintiffs brought this action to recover UM/UIM benefits alleging injuries and treatment, loss of consortium, and property damage.

12.

{¶ 24} Based on the foregoing, we conclude that the trial court properly determined that Ms. Hackathorn, Ms. Herrington, and Ms. Yontz breached the consent to settled provision of the Hackathorns' State Farm policy.

{¶ 25} First, and most importantly, it is undisputed that the three women signed their respective settlement and release agreements without State Farm's written consent. Plaintiffs now attempt to justify this choice through arguments, for example, that their counsel put State Farm on notice that negotiations were taking place and requested its assistance in the negotiations; that State Farm refused to assist in negotiations, therefore the three women settled; that Mr. Hackathorn did not settle his property damage issue "because State Farm specifically directed [counsel] not to address property damage, as it would deal directly with the tortfeasor's insurance company"; and that the "hide and seek nature" of State Farm's policy is unconscionable and against public policy. Plaintiffs additionally argue that under *McDonald v. Republic*, 45 Ohio St.3d 27 (1989), paragraph one of the syllabus, State Farm had an affirmative duty to aid plaintiffs in the protection of their subrogation rights, and if any rights were affected, it was "by State Farm's own action or inaction in its failure to aid Plaintiffs."[2]

---

[2] While not necessary to this decision, we note that *McDonald* is overruled to the extent that it is inconsistent with *Ferrando* and the position that "when an insurer's denial of UIM coverage is premised on the insured's breach of a consent-to-settle or other subrogation-related provision in a policy of insurance, the insurer is relieved of the obligation to provide coverage if it is prejudiced by the failure to protect its subrogation rights." *Ferrando*, 2002-Ohio-7217, at ¶ 88. Accordingly, plaintiffs are incorrect that State Farm had an affirmative duty to protect its interest. Additionally, even if there was any lingering ambiguity about the abrogation of *McDonald*, that case is distinguishable seeing that State Farm was never actually advised of any settlement offer—plaintiffs

13.

{¶ 26} These excuses for why plaintiffs acted the way that they did, do not negate the plain language of the policy—that an "insured" "must inform [State Farm] of a settlement offer… and the insured must request State Farm's written consent to accept such settlement offer."  Where an insurance contract is clear and unambiguous, its interpretation is a question of law. *Leber v. Smith*, 70 Ohio St.3d 548, 553 (1994); *Red Head Brass, Inc. v. Buckeye Union Ins. Co.*, 135 Ohio App.3d 616, 627 (9th Dist. 1999). In interpreting insurance policies, as with other written contracts, the court looks to the terms of the policy to determine the intention of the parties concerning coverage. *Minor v. Allstate Ins. Co., Inc.*, 111 Ohio App.3d 16, 20 (2d Dist. 1996).  The court must give the words and phrases in the policy their plain and ordinary meaning. *Id.*, citing *State Farm Auto. Ins. Co. v. Rose*, 61 Ohio St.3d 528, 531 (1991), *overruled on other grounds by Savoie v. Grange Mut. Ins. Co.*, 67 Ohio St.3d 500 (1993), paragraph one of the syllabus. "When the language of an insurance policy has a plain and ordinary meaning, it is unnecessary and impermissible for this court to resort to construction of that language." *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St. 3d 163, 166–67 (1984), citing *Travelers Indemnity Co. v. Reddick*, 37 Ohio St.2d 119, 121 (1974)

{¶ 27} Here, Sabrena and Johnny Hackathorn were named insureds on the policy. Ms. Hackathorn signed a settlement and release agreement without first informing State Farm of any offer or asking for written consent to accept the offer.  This was a clear breach of the Hackathorns' policy.

---

merely informed State Farm that there were negotiations occurring and invited State Farm to participate.

{¶ 28} Based on the above, we find that the Hackathorns' State Farm policy was breached when Ms. Hackathorn, Ms. Herrington, and Ms. Yontz settled with Ms. Sapp and her insurance, Dairyland without written consent from State Farm. Accordingly, we must next determine whether State Farm was prejudiced by this breach. *See Erdmann v. Kobacher Co.*, 2003-Ohio-5677, at ¶ 29.

{¶ 29} Under *Ferrando*, plaintiffs' breaches of the insurance policy were presumptively prejudicial to State Farm's rights. *Ferrando*, 2002-Ohio-7217, at paragraph two of the syllabus. As noted by State Farm, plaintiffs fail to provide any arguments or evidence to refute this presumption. Therefore, under the plain language of the policy, State Farm was relieved of its obligation to provide coverage to the "insureds" who breached the policy. Additionally, the policy language is clear that "[n]o legal action may be brought against [State Farm] *relating to* Uninsured Motor Vehicle Coverage for *any cause of action that rises out of or is related to that coverage* until there has been full compliance." (Emphasis added.). Therefore, even though only *some* of the plaintiffs breached the insurance policy, State Farm was relieved from its obligation to provide coverage to *all* of the plaintiffs.[3]

---

[3] State Farm raises a secondary argument that Ms. Yontz and Ms. Herrington were never entitled to receive UM/UIM benefits to begin with because they had their own UM/UIM policies. In response, plaintiffs argue that Ms. Yontz and Ms. Herrington do not qualify for their own UM/UIM policies because the trial court determined that they were not eligible to receive UM/UIM benefits under their own policies. Regardless of the theory, the ultimate outcome is the same—Ms. Yontz and Ms. Herrington are not entitled to benefits. The State Farm policy defines an "insured" as "any other person who is not insured (or uninsured motor vehicle coverage under another vehicle policy) while occupying… [the named insured's] car." Therefore, either the two women have their own policies, and were therefore never eligible for UM/UIM benefits under the Hackathorns'

15.

**{¶ 30}** Accordingly, no material issues of fact remain and the trial court properly granted summary judgment for State Farm. As such, we find plaintiffs' first and second assignments of error not well-taken.

### III. Conclusion

**{¶ 31}** For the foregoing reasons, we find plaintiffs-appellants' two assignments of error not well-taken, and we affirm the February 26, 2025 Judgment Entry of the Huron County Court of Common Pleas. Plaintiffs-appellants are ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

Thomas J. Osowik, P.J.
_____

_____
JUDGE

Christine E. Mayle, J.
_____

Gene A. Zmuda, J.
_____
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

policy, or they were uninsured/underinsured and were occupying the Hackathorns' vehicle as insureds under the Hackathorns' policy, and subsequently breached that policy when they settled without State Farm's written consent. Because the material analysis for this case would not be impacted, we decline to address this argument.