[Cite as *Toledo Fedn. of Teachers v. Bd. of Edn. of the Toledo City School Dist.*, 2019-Ohio-3025.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| Toledo Federation of Teachers | Court of Appeals No. L-18-1257 |
| Appellant | Trial Court No. CI0201703187 |
| v. | |
| Board of Education of the Toledo City School District | **DECISION AND JUDGMENT** |
| Appellee | Decided:  July 26, 2019 |

* * * * *

Richard M. Kerger and Kimberly A. Conklin, for appellant.

Margaret J. Lockhart and Shawn A. Nelson, for appellee.

* * * * *

**MAYLE, P.J.**

**{¶ 1}** Plaintiff-appellant, the Toledo Federation of Teachers, appeals the November 6, 2018 decision of the Lucas County Court of Common Pleas, granting summary judgment in favor of defendant-appellee, the Board of Education of the Toledo City School District.  For the reasons that follow, we reverse the trial court judgment.

## I. Background

{¶ 2} Toledo Federation of Teachers ("TFT") is a public employee labor union representing the teachers, paraprofessionals, and substitute teachers employed by the Board of Education of the Toledo City School District ("the board"). TFT and the board are parties to a collective bargaining agreement ("CBA"). Section XXXVI of the CBA governs "student activities, athletic events, and coaches' salaries." Subsection (C)(4) of that provision designates 25 days per high school year for coaches' attendance at athletic clinics, further assigned by sport. One athletic clinic is designated for track.

{¶ 3} On January 13, 2016, Keith Hershey, a math teacher and Bowsher High School's track coach, submitted a professional leave request and expense voucher, asking that he be permitted to attend a January 29, 2016 clinic in Columbus, Ohio sponsored by the Ohio Association of Track and Cross Country Coaches ("OATCCC"). The form requires the applicant to check one of three boxes designating the type of leave requested: (1) regular professional leave; (2) athletic; or (3) TPS approved program. Hershey checked the box designating the requested leave as "athletic."

{¶ 4} The month before Hershey submitted his request, on December 4, 2015, the board emailed the district's athletic director to advise that "No professional development leaves are being approved for anyone in the district without in-house coverage; we do not have enough subs to cover classes due to vacancies or illness, so leaves cannot be approved." The email further advised that leave would be approved if the professional seeking leave found in-house coverage during his or her absence and indicated on the

2.

form who would be providing that coverage. Hershey's professional leave request form did not indicate that he had secured in-house coverage. His request for leave to attend the OATCCC clinic was denied.

{¶ 5} Section II of the CBA sets forth a grievance procedure for resolving complaints by the TFT or one of its members alleging a "violation, misinterpretation, or misapplication" of the provisions of the CBA. It provides for an informal procedure and a three-level formal procedure for resolving such complaints. If a dispute has not been settled under these procedures, the TFT may elect to submit the dispute to binding arbitration.

{¶ 6} TFT filed a grievance alleging that the board violated Article XXXVII, Section C of the CBA when it denied Hershey's request for leave to attend the athletic clinic ("Hershey's grievance"). Hershey's grievance was not resolved informally, and was denied at all three levels of the formal procedure. On January 12, 2017, TFT requested arbitration.[1] The board denied this request, relying on Section II(C)(5) of the CBA, which provides as follows:

> The Board agrees that it will apply to all similar situations the decisions of an arbitrator sustaining a grievance, and the Federation agrees that it will not bring or continue to bring grievances that are similar to a grievance denied by the decision of an arbitrator.

---

[1] Hershey ultimately attended the clinic, but used a personal day to do so.

3.

The board maintained that Hershey's grievance was "similar to" a grievance that was denied by an arbitrator on May 26, 2016, in Grievance No. 2015.10.08af ("*Miller*" or "the *Miller* decision"), while Hershey's grievance was pending.

{¶ 7} In *Miller*, an art teacher at Woodward High School was notified that she was selected by lottery to attend an Ohio Art Education Association conference in Dayton, Ohio on November 5-6, 2015. Like Hershey, the teacher timely submitted a professional leave request and expense voucher for the conference (presumably, checking the box marked "regular professional leave"[2]), but her request was denied due to the substitute teacher shortage. The board had sent an email to school principals in October of 2014,[3] stating that "due to the lack of sub coverage in classrooms, no professional development is to be scheduled during the school day on Mondays and Fridays until further notice." This email did not include the caveat contained in the email to the athletic director indicating that leave would be approved if in-house coverage was secured and identified by the teacher requesting leave.

---

[2] Miller's professional leave request and expense voucher is not contained in the record.

[3] The affidavit of Angela Nowak, submitted by the board in support of its motion for summary judgment, indicates that principals were notified in September of 2015 that "due to the lack of substitutes, no professional development should be scheduled or approved during the school day"; however, the Nowak affidavit references an email attached as Exhibit E that is dated October 13, 2014, and provides that "due to the lack of sub coverage in classrooms, no professional development is to be scheduled during the school day on Mondays and Fridays until further notice."

**{¶ 8}** After exhausting the grievance procedures, Miller's grievance went to arbitration. TFT argued that the board violated Article XXX, Section (A)(7) of the CBA[4] when it denied Miller's request for professional leave to attend the art education conference. Miller's request for leave was ultimately granted before the scheduled arbitration, and the board argued that because the leave request was resolved, the grievance could no longer go forward on its merits. TFT insisted, however, that its grievance remained arbitrable because it had requested the board "to allow all TFT members similarly impacted to attend selected conferences," and "not all bargaining unit members who were winners in the professional leave lottery had their requests for leave approved."

**{¶ 9}** The arbitrator allowed Miller's grievance to go forward as a group grievance. Following arbitration, however, he concluded that "[t]he union's request that all of the teachers selected in the professional leave lottery be allowed to attend the conferences for which they were selected must be denied." He found that it was within the board's authority to deny a request for professional leave and given its staffing difficulties, the board did not exercise its authority in a manner that was arbitrary, capricious, discriminatory, or unreasonable.

---

[4] Under Article XXX, Section (A)(7), entitled "professional leave," "[t]he Board may grant teachers * * * time for professional meetings without loss of pay * * *. When leaves are approved by the Federation and the Board for which expenses are granted from the fund in A-6 above, substitutes shall be provided by the Board where necessary."

5.

{¶ 10} The board insisted that Hershey's grievance presented the same issue as *Miller*: whether the board was required to approve a request for a professional leave day. It maintained that under *Miller*, "the Board has the authority and discretion to deny a professional leave day and further that lack of substitutes is a valid and not arbitrary reason for denying such leave."

{¶ 11} TFT filed a complaint against the board in the Lucas County Court of Common Pleas under R.C. 2711.03, asking that the trial court enforce the arbitration agreement and require the board to arbitrate the grievance. The parties filed cross-motions for summary judgment. In a decision journalized on November 6, 2018, the trial court held that Hershey's grievance was not arbitrable because it was similar to the *Miller* decision and, therefore, subject to the "exclusionary clause" in Section II(C)(5) of the CBA. It granted summary judgment in favor of the board and against TFT.

{¶ 12} TFT appealed and assigns the following error for our review:

THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF APPELLEE BOARD OF EDUCATION AND DENIED APPELLANT'S CROSS MOTION BY INCORRECTLY INTERPRETING THE PARTIES['] CBA TO EXCLUDE APPELLANT'S GRIEVANCE FROM ARBITRATION.

## II. Standard of Review

{¶ 13} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same

6.

standard as trial courts.  *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989).  The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.

*Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 14} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).  When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984).  A "material" fact is one which would affect the outcome of the suit under the applicable substantive law.  *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826,

7.

675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

### III.  Law and Analysis

{¶ 15} In its sole assignment of error, TFT argues that in granting the board's summary-judgment motion, the trial court exceeded its authority and ruled on the merits of the underlying dispute rather than limiting its review to the arbitrability of the grievance.  TFT maintains that by reaching the conclusion that the present grievance was "similar to" the *Miller* decision, the trial court improperly engaged in an interpretation of the CBA.

{¶ 16} The board responds that because the trial court was charged with determining whether the dispute was subject to arbitration, and because the CBA prohibits TFT from arbitrating grievances that are similar to a grievance denied by the decision of an arbitrator, it was necessary for the trial court to determine whether the current grievance was similar to the *Miller* grievance.  Related to this, the board maintains that Hershey is a member of the "class" of employees covered by the *Miller* decision, so his grievance may not be relitigated.

{¶ 17} We review de novo the question of whether, as a matter of law, a particular claim is subject to arbitration.  *Hussein v. Hafner & Shugarman Ents., Inc.*, 176 Ohio App.3d 127, 2008-Ohio-1791, 890 N.E.2d 356, ¶ 23 (6th Dist.).  Relying on precedent from the U.S. Supreme Court and the Supreme Court of Ohio, we have recognized that there are four general principles that guide the analysis of whether a claim is subject to

8.

arbitration: (1) "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"; (2) the question of whether a dispute is arbitrable is an issue for judicial determination; (3) "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims"; and (4) where a contract contains an arbitration clause, there is a presumption of arbitrability and arbitration should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (Internal quotations and citations omitted.) *Toledo Police Command Officers' Assn. v. Toledo,* 2014-Ohio-4119, 20 N.E.3d 308, ¶ 53 (6th Dist.).

{¶ 18} The Supreme Court of Ohio applied these principles in *Council of Smaller Ents. v. Gates McDonald & Company*, 80 Ohio St.3d 661, 687 N.E.2d 1352 (1998). In *Gates McDonald*, COSE and Gates McDonald were parties to a services agreement. The agreement provided that "[a]ll disputes and controversies of every kind and nature between Gates and COSE that may arise as to the existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance, or termination of this Agreement shall be submitted to arbitration * * *." *Id.* at 663. The agreement required that any demand for arbitration be made in writing within 90 days after the controversy arose. A dispute arose between the parties, and Gates McDonald demanded arbitration, but COSE contended that the demand was not made within 90 days after the controversy arose, thereby barring Gates McDonald

9.

from arbitrating its claims. COSE filed suit in common pleas court seeking a declaratory judgment to this effect.

{¶ 19} COSE moved for judgment on the pleadings, arguing that it was for the court, not the arbitrator, to determine whether Gates McDonald failed to comply with the 90-day time limit. The trial court granted COSE's motion without issuing an opinion, and the appellate court reversed, holding that the trial court should have declared that the parties were required to submit to arbitration. The Supreme Court of Ohio allowed a discretionary appeal for resolution of the issue of who must determine the construction and consequences of the 90-day demand provision in the parties' agreement: the court or an arbitrator.

{¶ 20} COSE claimed that the 90-day arbitration demand provision was a "condition precedent" that qualified the agreement to arbitrate, and that the parties intended for the court, not an arbitrator, to construe this provision of the agreement. It maintained that the trial court properly undertook to construe the provision, and properly determined that Gates McDonald's demand was untimely. Gates McDonald asserted that regardless of whether the 90-day provision operated as a "condition precedent" to arbitration, the parties intended to have an arbitrator construe and apply the provision as a threshold matter.

{¶ 21} The Ohio Supreme Court observed that the agreement contained a broad arbitration clause, requiring arbitration of "[a]ll disputes and controversies of every kind." *Id.* at 664. Inclusion of this provision meant that there was a presumption in favor

10.

of arbitrability, and in challenging arbitration, it was COSE's burden to overcome this presumption.

{¶ 22} Citing the U.S. Supreme Court's decision in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 556-557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Ohio Supreme Court observed that questions concerning the procedural prerequisites to arbitration develop not in a vacuum, but in the context of an actual dispute about the rights of the parties to the contract. *Gates McDonald* at 664. "'Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration.'" *Id.* at 665, quoting *John Wiley & Sons* at 556-557. Accordingly, once it has been determined that the parties' dispute is one that is subject to arbitration, "procedural" questions that grow out of the dispute and bear on the final disposition are also for the arbitrator to decide. *Id*.

{¶ 23} The court found that the inclusion of the broad arbitration provision in the parties' agreement gave rise to a presumption of arbitrability, even as to the disagreement over the 90-day demand provision. It was, therefore, incumbent on the trial court to order arbitration "unless it could be determined with 'positive assurance' that the dispute was not susceptible of arbitration." *Id.* at 667.

{¶ 24} After the court examined the parties' positions in the context of the four principles of arbitration recited earlier in this decision, it observed that to overcome the

11.

presumption in favor of arbitrability required COSE to point to an "express exclusion," "explicit language," or "forceful evidence" from the bargaining history that factual disputes arising from the 90-day demand provision were not subject to arbitration. *Id.* at 668. It found that the agreement contained no "explicit language" providing that disputes respecting the 90-day provision were not subject to arbitration, the 90-day provision was "not so clear on what demands are untimely so as to be self-executing," and COSE presented no evidence at all of negotiating history with respect to this question. *Id.* As such, it concluded, COSE failed to overcome the presumption in favor of arbitrability. Accordingly, the court held that the dispute over the timeliness of Gates McDonald's arbitration demand was a matter for interpretation by the arbitrator—not the court.

{¶ 25} In the present case, the parties appear to agree that the Hershey grievance would be arbitrable if *Miller* had not been decided. Their dispute is over (a) whether the Hershey grievance is "similar to" *Miller,* and (b) who—the court or the arbitrator— determines whether the grievances are "similar to" one another. The board insists that section II(C)(5) operates as an exclusion to the broad arbitration provision contained in the CBA. Because the trial court is charged with determining arbitrability, it claims, the court properly found that the exclusion rendered the dispute not subject to arbitration. There are two problems with the board's position.

{¶ 26} First, it is not clear from the plain language of the CBA that section II(C)(5) is, in fact, an exclusion to the arbitration provision, let alone an "express exclusion." Under section II(C)(5), TFT agreed not to "*bring* or *continue to bring*

12.

grievances that are similar to a grievance denied by the decision of an arbitrator."

(Emphasis added.) In other words, TFT agreed to refrain from *initiating* any grievance similar to one that has already been denied by an arbitrator. *See Chandler v. D.C. Dept. of Corr.*, 145 F.3d 1355, 1359 (D.C.Cir.1998) ("[T]he phrase "bring a civil action" means to initiate a suit."); *Walters v. Livingston*, 514 S.W.3d 763, 767 (Tex.App.2016) (interpreting plain and common meaning of "bring an action" to mean the initiation of proceedings); Black's Law Dictionary (11th Ed.2019) (defining "bring an action" to mean "[t]o sue; institute legal proceedings"). It does not speak to TFT's ability to exhaust the grievance procedure with respect to an *already-pending* grievance that may—or may not—be impacted by an intervening decision of an arbitrator. *See Harris v. Garner*, 216 F.3d 970, 974 (11th Cir.2000) ("'[B]rought' and 'bring' refer to the filing or commencement of a lawsuit, not to its continuation."); *Walters* at 767 (observing that phrase "may not bring an action" is "forward looking"). The provision merely requires prospective application of arbitration decisions to similar, not-yet-filed grievances. It does not, by its plain language, bar arbitration of a pending grievance.

{¶ 27} Second, the board's position ignores the fact that while section II(C)(5) potentially operates to exclude certain grievances from arbitration, it is by no means self-executing. Rather, application of section II(C)(5) requires knowledge of the CBA, analysis of its terms, and consideration of the unique factual circumstances of both the current grievance and the purportedly similar grievance. And the provision itself does not specify who is to perform this analysis.

13.

{¶ 28} Like *Gates McDonald,* the broad arbitration provision contained in the agreement creates a presumption in favor of arbitrability. This presumption extends to interpretation of section II(C)(5). To overcome this presumption, the board needed to point to an "express exclusion," "explicit language," or "forceful evidence" from the bargaining history indicating that factual disputes over whether two grievances are "similar" are not subject to arbitration. It failed to do so, and from our review of the CBA, no such evidence exists. Therefore, to the extent that it can be said that section II(C)(5) excludes certain disputes from arbitration, it is for the arbitrator to determine the applicability of this provision.

{¶ 29} In sum, the plain language of section II(C)(5) does not operate to exclude from arbitration an already-pending grievance that may potentially be impacted by an intervening decision of an arbitrator. And even if it did, it would be the responsibility of the arbitrator to determine whether two grievances are "similar." Accordingly, we find TFT's sole assignment of error well-taken.

## IV. Conclusion

{¶ 30} We find TFT's sole assignment of error well-taken. Section II(C)(5) of the CBA prohibits the TFT from initiating a new grievance that is similar to a grievance denied by the decision of an arbitrator; it does not prohibit TFT from electing to arbitrate a grievance that was already pending at the time a similar grievance is denied by the decision of an arbitrator. Moreover, whether two grievances are "similar" requires knowledge of the CBA, analysis of its terms, and consideration of the unique factual

14.

circumstances of both grievances. In the absence of an "express exclusion," "explicit language," or "forceful evidence" from the bargaining history indicating an intent to reserve the issue for the trial court, the determination of whether two grievances are "similar" is a matter for the arbitrator. We reverse the November 6, 2018 decision of the Lucas County Court of Common Pleas, and remand to the trial court so that it may enter an order declaring the parties' dispute arbitrable. The board is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

_____

Christine E. Mayle, P.J. _____
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.