[Cite as *Am. Family Ins. v. Phillips*, 2017-Ohio-8670.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

American Family Insurance                    Court of Appeals No. OT-17-004

  Appellee                                   Trial Court No. 2015-CV-H-195

v.

James Phillips, et al.                       **DECISION AND JUDGMENT**

  Appellants                                 Decided:  November 22, 2017

* * * * *

Donald P. Wiley and Tonya J. Rogers, for appellee.

David Rodman Cooper, for appellants Jim Phillips Excavating, Inc.,
Jim Phillips and Jake Phillips.

Peter C. Munger and Marshall A. Kupresanin, for appellant
Woodville Mutual Insurance Company.

Andrew C. Stebbins, for appellant Erie Insurance Exchange.

* * * * *

**JENSEN, P.J.**

{¶ 1} Defendants-appellants, Woodville Mutual Insurance Company

("Woodville"), Erie Insurance Exchange ("Erie'), Jim Phillips ("Jim"), Jake Phillips

("Jake"), and Jim Phillips Excavating, Inc. (collectively, "the Phillips defendants"),

appeal the December 30, 2016 judgment of the Ottawa County Court of Common Pleas granting summary judgment in favor of plaintiff-appellee, American Family Insurance Company ("American Family"), and denying summary judgment in favor of Woodville and Erie. For the reasons that follow, we affirm the trial court judgment.

## I. Background

{¶ 2} Walter Apling hired Jake Phillips to demolish his barn for $3,000. Jake presented Apling with two methods for accomplishing the demolition. The method Apling selected—the less expensive of the two options—required Jake to dig a pit about 25-30 feet deep, knock down the barn, gather debris from the barn into the pit, and burn the debris. Jake, who worked for his father's company, Jim Phillips Excavating, had performed this type of job approximately ten times.

{¶ 3} Jake began the project on April 3, 2013. He hauled his father's excavator to the property that day and dug the pit. Jake returned around 7:00 the next morning and knocked down the barn. He put the roofing material in the pit and ignited it with a propane torch. Using the excavator, he began gathering debris from the barn to be dumped into the pit. At approximately 7:30 a.m., Jake noticed that the wind had picked up, so he decided to stop working. He allowed the fire to burn out, and about an hour later, when he saw no sign of fire, he left the Apling property.

{¶ 4} On his way home, Jake stopped at NAPA Auto Parts to buy oil for the excavator. While at NAPA, he received a call from a friend who works for the Carroll Township fire department. He told Jake that a fire had been reported at the Apling

2.

property. Jake returned to find the barn demolition engulfed in flames. The fire spread to Apling's granary, and then to his home and garage. Experts opined that the fire was caused by Jake's failure to properly extinguish the fire before leaving the Apling property.

{¶ 5} Losses to Apling's real and personal property, and for living expenses incurred for substitute housing, totaled $313,553.55. Apling's insurer, Woodville, compensated him for his losses, and Erie issued payment to Apling's brother, Charles Apling, who resided with him and incurred separately-insured losses of his own. Woodland and Erie pursued claims for indemnification against Jake Phillips, Jake's father, Jim Phillips, and Jake's employer, Jim Phillips Excavating, Inc., in Ottawa County case No. 2013-CV-435H.

{¶ 6} The Phillips defendants sought coverage under Jim's farm/ranch policy maintained with American Family. Jake is an "insured" under that policy. American Family retained counsel for the Phillips defendants and provided a defense in the indemnification action subject to a reservation of rights. It filed the present action for declaratory judgment on June 29, 2015, against the Phillips defendants, Woodville, Erie, and Hanover and Progressive Insurance Companies, which were believed to insure tractors owned by Jim Phillips Excavating, Inc. American Family sought a declaration that it owed no duty to defend or indemnify the Phillips defendants because (1) the Phillips defendants failed to notify American Family of the claim until November 11,

3.

2014, thereby violating the policy's prompt-notice provision; and (2) coverage was precluded under the policy's business-pursuit exclusion.

{¶ 7} A consent judgment was reached in Ottawa County case No. 2013-CV-435H, pursuant to which the Phillips defendants consented to a judgment in favor of Woodville and Erie in the amounts of $209,488.66 and $40,260.34, respectively. Woodville and Erie counterclaimed against American Family in the present case, seeking to require American Family to satisfy the consent judgment.

{¶ 8} Following a period of discovery, American Family, Woodville, and Erie filed cross-motions for summary judgment. The bases for American Family's motion essentially mirrored the allegations in its complaint for declaratory judgment: the Phillips defendants breached the timely notice provision in the policy, and coverage was excluded because Jake was engaged in a business pursuit at the time of the loss.

{¶ 9} In a judgment dated December 30, 2016, the trial court found that American Family was not prejudiced by the Phillips defendants' failure to provide prompt notice of the loss, but it granted summary judgment to American Family based on the business pursuit exclusion contained in the policy. The court denied Woodville and Erie's motions for summary judgment. Woodville, Erie, and the Phillips defendants appealed this judgment and assign the following errors for our review:

4.

FIRST ASSIGNMENT OF ERROR

The Trial Court erred when it misapplied the American Family Business Activity Exclusion given the uncontested evidence which demonstrated the transaction concerned was not a business activity nor was it profit motivated.

SECOND ASSIGNMENT OF ERROR

The Trial Court erred when it denied Woodville Mutual Insurance Company Summary Judgment.

THIRD ASSIGNMENT OF ERROR

The Trial Court erred when it ignored and failed to even address the related request for Summary Judgment filed by Defendants Jim Phillips, Jake Phillips, and Phillips Excavating Company.

## II. Standard of Review

{¶ 10} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The motion may be granted only when it is demonstrated:

(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the

party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 11} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

### III. Law and Argument

{¶ 12} Woodville, Erie, and the Phillips defendants all appealed the trial court judgment. Woodville filed an initial brief and a reply brief setting forth arguments in

6.

support of its challenge to the trial court judgment; Erie and the Phillips defendants filed "joinders" adopting Woodville's position.

{¶ 13} Appellants contend in their first assignment of error that the trial court misapplied the business-pursuit exclusion. They contend in their second assignment of error that the trial court erred in denying Woodville and Erie's motions for summary judgment. And in their third assignment of error, they contend that the trial court erred in failing to address the Phillips defendants' motion for summary judgment.

### A. The "Business Pursuit" Exclusion

{¶ 14} In granting summary judgment in favor of American Family, the trial court concluded that the business-pursuit exclusion of the American Family farm/ranch policy precluded coverage. That exclusion provides:

Business. We will not pay for damages due to bodily injury or property damage arising out of business pursuits of any insured, except:

a. Activities normally considered non-business; or

b. The occasional or part-time business activities of any self-employed insured under 19 years of age.

The policy defines "business" as "[a]ny profit motivated full or part time employment, trade, profession or occupation, and including the use of any part of the premises for such purposes."

{¶ 15} The trial court concluded that Jake's business activity gave rise to the fire, thus coverage was excluded under the American Family policy. Appellants argue that the

7.

trial court's decision was wrong because (1) Jake did not perform the barn demolition on behalf of Phillips Excavating business; (2) the barn demolition was not "profit motivated" and was not a business activity of Phillips Excavating; and (3) Jake's conduct in leaving the property without properly extinguishing the fire was a "non-business" activity.

{¶ 16} Insurance contracts are construed using the same rules as other written contracts. *Universal Underwriters Ins. Co. v. Shuff*, 67 Ohio St.2d 172, 173, 423 N.E.2d 417 (1981). Where the policy's language is clear and unambiguous, its interpretation is a matter of law and the court may not "resort to construction of that language." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (1992), citing *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 167, 462 N.E.2d 403 (1984). The words and phrases used in the policy must be given their natural and commonly accepted meaning. *Id*. Ambiguous provisions—particularly provisions purporting to exclude or limit coverage— must be construed strictly against the insurer and liberally in favor of the insured. *Westfield Ins. Co. v. Hunter*, 128 Ohio St.3d 540, 2011-Ohio-1818, 948 N.E.2d 931, ¶ 11. "However, the rule of strict construction does not permit a court to change the obvious intent of a provision just to impose coverage." *Hybud Equip.* at 665.

### B. Business Pursuit

{¶ 17} American Family claims that for an activity to constitute a "business pursuit," as the phrase is used in the exclusion, two elements must be established: (1) continuity and (2) profit motive. "Continuity" requires "'a customary engagement or

8.

a stated occupation.'" *Lenart v. Doversberger*, 8th Dist. Cuyahoga Nos. 65372, 65373, 1994 Ohio App. LEXIS 2063, *19 (May 12, 1994), quoting *Asbury v. Indiana Union Mut. Ins. Co.*, 441 N.E.2d 232, 237 (Ind.App.1982). "Profit motive" requires that the activity be performed as "'a means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagements.'" *Id*.

{¶ 18} American Family contends that the barn demolition project satisfies both elements. As to "continuity," it maintains that Jake earns a living by performing the type of work at issue here. While it notes that Phillips Excavating performs this type of work, that Phillips Excavating had completed projects for Apling in the past, and that Jake used his father's excavator for the project, it insists that for purposes of the business pursuit exclusion, it makes no difference whether Jake was acting on behalf of his father's company or whether he was simply acting in his individual capacity.

{¶ 19} As to the "profit motive element," American Family relies on Jake's deposition testimony. It urges that Jake admitted that he took the job with the intent to take money, and Jake's profit motivation is demonstrated by the fact that he and Apling negotiated as to the method and the price for performing the work. American Family insists that in determining whether there was a "profit motive," it is of no matter whether a profit was actually earned.

{¶ 20} Appellants maintain that there is "zero" evidence of continuity and profit motive. They deny that the work was performed on behalf of Phillips Excavating or that Jake undertook the project for profit. Rather, they claim, Jake agreed to perform the

9.

work because Apling was a "country neighbor" with whom he had "more not a business relationship than a business relationship." They claim that "there was no evidence or testimony providing Jake Phillips' activity was profit motivated nor did he factor profit into the price." And they remark that the fee for the job was ultimately waived.

{¶ 21} Jake was deposed by Woodville in case No. 13-CV-435H on June 6, 2014. He testified that he has been working for his father's company all his life and is paid weekly at an hourly rate. His younger brother also works for the company, and his mother calculates payroll and prepares tax documents.

{¶ 22} Jake explained that about a week before the fire, Apling contacted him about the barn demolition project. Jake had known Apling for some years because they live in a small town where "you kind of know everybody," but he did not know him well. Apling asked Jake to come over to his property so they could discuss the project.

{¶ 23} Jake went to the property by himself and Apling showed him the area. Apling showed Jake where the barn was and where he wanted him to dig the hole to bury it. This was a job Jake had done many times in the past. The plan was for Jake to dig a hole, take the barn down, burn the barn, and cover the hole with rocks. Jake would provide any necessary equipment or materials. They agreed on a price of $3,000.

{¶ 24} Jake told Jim that he had accepted the work. Jake testified:

Q: Before moving the equipment over there that day, did you tell your dad you had made the arrangements for this job to take place?

A: Yes, I did.

Q: That was with his consent?

A: Yes.

{¶ 25} Jake set the price for the work. While Jim was not consulted about the price, Jake told him the figure that he and Apling agreed upon:

Q: Did [your dad] have any say in what you charged, in what you were being paid because you said Mr. Apling gave you that figure?

A: I gave Mr. Apling the figure.

Q: You told him what it was going to be, is that okay?

A: Yes.

Q: Your dad didn't have any trouble with that?

A: No, he did not.

Q: He was aware of it.

A: Yeah.

Q: Did you involve your dad in pricing the job?

A: No, I did not.

{¶ 26} Jake set a price that would cover the cost of the materials and compensate him for his own labor:

Q: What were you factoring in—how did you come up with [$]3,000?

A: Just on the time I estimated to take.

Q: Which was what?

11.

A: All day. And all day, and then another day to come out with the dozer and grade everything out.

Q: So that was the plan?

A: Yes.

Q: You wanted to allow enough money to be charged to cover the expense associated with that?

A: Yes.

Q: To cover labor, material, equipment, fuel, all the stuff you need, right?

A: Yes.

{¶ 27} Jake was re-deposed in the present case on June 27, 2016. In response to questions by American Family, Jake testified that he planned to get paid for the barn demolition, he took the job "to make money," and he ultimately waived the fee because of the fire:

Q: Were you planning on charging [Apling] money for this job?

A: I was going to.

Q: Okay. And I understand that because of the fire no money ever did change hands, correct?

A: Correct.

12.

Q: But when you entered into this agreement, you were going—you were intending to get paid, correct?

A: Correct.

Q: And what was the amount that you had agreed with Mr. Apling would be the cost for this job.

A: Three or [$]3,500. I don't remember exactly now.

* * *

Q: How long did you expect the job to take from start to finish when you entered into the agreement?

A: Two days.

Q: So about $3,000 to $3,500 for two days of work?

A: Correct.

Q: Would that be about 16 hours total?

A: Somewhere, roughly in there.

Q: Okay. And was the object of the exercise from your point of view to make money?

A: Well, yeah.

Q: Okay. You weren't expecting to lose money on this job?

A: No.

Q: Your hope was to make some sort of profit, correct?

A: Correct.

13.

Q: And because the fire occurred and everything that occurred after that, you never ended up going back to Mr. Aplet—Apling, excuse me, and saying Where's my money?

A: No.

{¶ 28} Woodville cross-examined Jake and tried to tell a different story: one of a neighbor doing a project as a favor to another neighbor with no thought of profiting from the work.

Q: And the idea of these questions about profit, if I understand correctly. You and Mr. Apling talked about an exchange of money for what you were going to do, right?

A: Right.

* * *

Q: So the idea of whether it was, in fact, even gonna be profitable you can't say for sure because the fire happened before everything was done, right?

A: Correct.

Q: So it would not be accurate to refer to this as a for-profit transaction, correct?

A: Correct.

* * *

Q: Now, you knew Mr. Apling probably since you were a boy, right?

A: Yeah.

Q: I mean, he described to me meeting you as a youngster with your dad in prior years. So you've known him for a long, long time?

A: Correct.

Q: And this is sort of an agricultural rural area. And when you say neighbor, it's a country neighbor, right?

A: Correct.

Q: I mean lots of folks fit that definition, right?

A: Correct.

Q: All right. And so the deal you entered into with him was because of your relationship with Mr. Apling over the years, correct?

A: Correct.

Q: It wasn't just a business relationship?

A: No.

Q: In fact, it was more—it was more not a business relationship than a business relationship, right?

A: Correct.

{¶ 29} So despite Jake's acknowledgment that he took the job to make money and factored in compensation for his labor, Woodville tries to characterize the project as one

not intended "for profit," but rather to assist a "country neighbor." In support of its position, Woodville also cites an affidavit from Apling indicating that "there was no discussion of the Jake Phillips' work being done as a business transaction [or] of the activity being done as a Phillips Excavating Company project."

{¶ 30} Regardless of whether anyone explicitly called the job a "business transaction," or whether Jake's relationship with Apling motivated him to take the job, appellants cannot avoid application of the business pursuit exclusion because Jake's testimony makes clear that the project was one performed as part of his usual trade, and his desire to earn a profit played some role in his decision to accept the job and in establishing the price.

{¶ 31} Other courts have reached the same conclusion based upon similar facts. For instance, in *Lenart*, 8th Dist. Cuyahoga Nos. 65372, 65373, 1994 Ohio App. LEXIS 2063, the court examined a similar policy exclusion. There the insured, Craig, was remodeling a bathroom for a friend, Doversberger, who resided in a condominium complex. While Craig was performing work on the bathroom, a fire erupted and spread to the upstairs neighbor's unit. Craig sought coverage under his homeowners' insurance policy for the damages arising from his negligence. The policy included a clause much like the one at issue here excluding from coverage losses arising from "business pursuits."

{¶ 32} Craig maintained that he was not engaged in a business pursuit, but rather was remodeling the bathroom as a gratuitous gift for a friend. He admitted that his

16.

primary source of income for the last 14 years was derived from remodeling projects. He gave conflicting testimony about whether he intended to charge Doversberger for the cost of materials, denied discussing payment, but conceded that he never told Doversberger that the work would be performed for free. Doversberger, on the other hand, admitted that he hired Craig to do the work and he expected to pay Craig, but they had not yet determined the price because the scope of the work required had not yet been ascertained.

{¶ 33} The court adopted the two-prong approach for identifying what constitutes a "business pursuit," and discussed at length the "profit motive" element. It recognized several principles: (1) profit motive does not necessarily require that an actual profit be realized; (2) one may engage in a business activity with a profit motive even if actual profit is not the immediate or primary consideration; (3) employment will not be excluded from the classification of business merely because it results in a loss instead of a profit, but livelihood or profit must be at least one of the purposes for which the employment is pursued; (4) a pursuit may nonetheless constitute a business even if it is in addition to an insured's regular and customary occupation; and (5) an isolated activity may be a business pursuit depending on the unique facts of the case. *Id.* at *15-20.

{¶ 34} The court held that even if Craig demonstrated that he intended to remodel Doversberger's bathroom free of charge—despite the evidence to the contrary—the activity nonetheless constituted a business pursuit.

{¶ 35} We reach the same conclusion here. We find that despite the narrative that Woodville sought to advance when it deposed Jake in 2016, by his own admission, Jake

17.

undertook the Apling barn demolition—the type of work he customarily performs to earn a living—with *a* purpose of making a profit. *Erie Ins. Exchange v. Bullock*, 2015-Ohio-5406, 55 N.E.3d 460, ¶ 30 (5th Dist.) ("[A]ctual profit need not be an immediate or even primary consideration of a business pursuit. * * * The venture may be a side business or an activity that the insured pursues primarily for purposes other than pecuniary gain."); *Watkins v. Brown*, 97 Ohio App.3d 160, 165, 646 N.E.2d 485 (2d Dist.1994) (recognizing that "profit" includes gain produced by labor). Whether Jake performed the work on behalf of his employer or whether he did so individually is not relevant. *See Bullock* at ¶ 30; *Zurcher v. Jones*, 9th Dist. Wayne C.A. NO. 99CA0055, 2000 Ohio App. LEXIS 5535, *5 (Nov. 29, 2000) (holding that business exclusion applied even where insured was performing a side job apart from the roofing company for which he worked). Nor is it relevant whether he actually made a profit. *See State Auto. Mut. Ins. Co. v. Dolosich*, 135 Ohio App.3d 601, 608, 735 N.E.2d 38 (8th Dist.1999) (finding that horse farm was a business pursuit even though it generated income of only $500 per month which was used exclusively to pay expenses of maintaining the horses). That Jake testified in 2016, claiming to have undertaken the work because of his acquaintance with Apling, does not undermine our conclusion. *See Lenart* at 21-23; *Watkins* at 165.

{¶ 36} We find that the trial court properly applied the business pursuit exclusion.

### C. Activities Normally Considered Non-business

{¶ 37} Relying on the exception to the business pursuit exclusion—for "activities normally considered non-business"—appellants claim that the barn demolition was not a

18.

business pursuit because "failing to extinguish a fire and/or leaving it unattended is not exclusively a business activity." In essence, appellants argue that by performing the barn demolition negligently, it can no longer be deemed a business activity.

{¶ 38} A similar argument was rejected in *Titterington v. Portman*, 11th Dist. Geauga No. 95-G-1933, 1996 Ohio App. LEXIS 1223, *7 (Mar. 29, 1996). In *Titterington,* a child was attacked by her babysitter's dog. Coverage under the babysitter's insurance policy was denied under a business-pursuit exclusion similar to the one here. Appellants argued that the dog attack was not related to the business of babysitting, thus the exception to the exclusion should apply. The court held that the "failure to provide a safe location for the children to stay did not remove this incident from the business activity exclusion, as keeping children in a safe place is a part of the business of babysitting." *Id.* at *7. *See also State Farm Fire & Cas. Co. v. Straw,* 9th Dist. Medina No. 2849-M, 2000 Ohio App. LEXIS 284, *9-11 (Feb. 2, 2000).

{¶ 39} As in *Titterington,* where keeping the child safe—including safe from the babysitter's dog—was a part of the business of babysitting, properly controlling the fire was a part of the barn demolition business in which Jake was engaged. It was incumbent on Jake to ensure that the fire was contained and properly extinguished, and his failure to do so does not render the activity "non-business."

{¶ 40} Because the barn demolition constituted a business pursuit, and no exception applied to render it otherwise, we find appellants' first assignment of error not well-taken. Moreover, because the trial court correctly concluded that this exclusion

19.

applied to bar coverage, it properly denied Woodville and Erie's motions for summary judgment. Thus, we also find appellants' second assignment of error not well-taken.

### D. The Phillips Defendants' "Motion"

**{¶ 41}** In their third assignment of error, appellants contend that the trial court erred in failing to rule on the Phillips defendants' motion for summary judgment. While the Phillips defendants filed a "Reply in Support of Defendant Woodville Insurance Company and Erie Insurance Exchange's Motions for Summary Judgment," they did not file their own motion for summary judgment. We find no error in the trial court's failure to rule on a non-existent motion.

**{¶ 42}** We find appellants' third assignment of error not well-taken.

### IV. Conclusion

**{¶ 43}** We find that the business pursuit exclusion contained in the American Family insurance policy precluded coverage for the losses sustained as a result of the barn demolition project. No exception to the exclusion applied. We, therefore, find appellants' three assignments of error not well-taken and affirm the December 30, 2016 judgment of the Ottawa County Court of Common Pleas. Appellants are ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.          _____
                                                         JUDGE

Thomas J. Osowik, J.

                                      _____
James D. Jensen, P.J.                               JUDGE
CONCUR.

                                      _____
                                                          JUDGE