[Cite as *Buehrer v. Meyers*, 2020-Ohio-3207.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

| | |
|---|---|
| Hannah L. Buehrer, Administratrix, et al. | Court of Appeals No. WM-19-009 |
| Appellants | Trial Court No. 17 CI 054 |
| v. | |
| Kristy L. Meyers, et al. | **DECISION AND JUDGMENT** |
| Appellee | Decided: June 5, 2020 |

* * * * *

Chad M. Tuschman and Peter O. DeClark, for appellants.

Peter C. Munger, for appellee.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from the judgment of the Williams County Court of

Common Pleas, which granted the motion for summary judgment by the

intervenor-appellee, Auto-Owners (Mutual) Insurance Company, and declared the

intervenor-appellee's insurance policy coverage obligations. For the reasons set forth

below, this court affirms the judgments of the trial court.

{¶ 2} On April 27, 2017, as amended on December 3, 2018, plaintiffs-appellants Daniel C. Buehrer, individually, and Hannah L. Buehrer, individually, and as administratrix of the estate of their deceased son, Z.B., filed a complaint against defendants Kristy Meyers and Dustin Meyers, alleging claims of wrongful death, emotional distress, and loss of consortium for the death of their ten-week-old son while in the paid care of Mrs. Meyers in the defendants' home. They alleged that on December 21, 2016, the infant was unattended in Mrs. Meyers' home and was later discovered having trouble breathing after she had left him lying on a queen-size bed on top of pillows. The infant died on December 23, 2016, from seizures, acute respiratory failure, and severe brain swelling leading to anoxic brain damage and herniation of the brain stem.

{¶ 3} On June 19, 2017, the trial court granted appellee's motion to intervene to file a declaratory judgment action due to the homeowner's insurance policy with the defendants in effect at the time of the incident. As amended on January 14, 2019, appellee filed a declaratory judgment complaint for the trial court to determine its coverage obligations under the insurance policy with the defendants for appellants' claims. Appellee alleged Mrs. Meyers' child care activities were not covered by the insurance policy, and it did not have a duty to indemnify or defend the defendants from the appellants' claims.

{¶ 4} Previously, on April 13, 2018, Mrs. Meyers filed for Chapter 7 bankruptcy protection. She also did not respond to appellee's complaint. On February 7, 2019, appellants voluntarily dismissed Mr. Meyers pursuant to Civ.R. 41(A)(1)(a).

{¶ 5} After discovery ensued, appellee filed a motion for summary judgment on February 11, 2019, arguing its homeowner's policy with the defendants provided no coverage for the appellants' claims. Appellee alleged the policy excluded coverage for an in-home business, and Mrs. Meyers operated a home day care business giving rise to appellants' claims. Mrs. Meyers did not oppose appellee's motion. Appellants opposed the motion, and on May 30, 2019, the trial court granted summary judgment to appellee. The trial court then declared that the insurance policy provided no personal liability or med-pay coverage to the defendants for any of appellants' claims arising from Mrs. Meyers' care of the infant in her home on the date of his injury. The trial court further declared that coverage for claims arising from Mrs. Meyers' home day care services is specifically excluded under the insurance policy's terms and conditions.

{¶ 6} This court previously determined appellants had standing to appeal the trial court's May 30, 2019 judgment. *Buehrer v. Meyers,* 6th Dist. No. WM-19-009 (Sept. 24, 2019). Appellants then filed this appeal, setting forth one assignment of error:

> The trial court erred when it granted intervenor Auto-Owners (Mutual) Ins. Co.'s motion for summary judgment as probative and competent evidence was presented to the trial court which established

3.

genuine issues of material fact existed relative to the application of the business exclusion.

## I. Summary Judgment

{¶ 7} We review de novo the trial court's summary judgment determination, employing the same Civ.R. 56 standard as trial courts. *Chalmers v. HCR ManorCare, Inc.*, 6th Dist. Lucas No. L-16-1143, 2017-Ohio-5678, ¶ 21; *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 29.

{¶ 8} "The main purpose of the summary judgment statute is to enable a party to go behind allegations in the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Cunningham v. J. A. Myers Co.*, 176 Ohio St. 410, 413, 200 N.E.2d 305 (1964) (evaluating former R.C. 2311.041(D), now Civ.R. 56).

{¶ 9} Summary judgment may be granted only

if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law * * * [and] that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

4.

Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

{¶ 10} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought and identify those portions of the record that affirmatively demonstrate the absence of a genuine issue of material fact—not the reliance on conclusory assertions that non-movant has no evidence to prove its case—regarding an essential element of the non-movant's case. *Beckloff v. Amcor Rigid Plastics USA, LLC*, 6th Dist. Sandusky No. S-16-041, 2017-Ohio-4467, ¶ 14. When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact for trial in accordance with Civ.R. 56(E). *Id*. A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Id*.

## II. Business Exclusion Provision

{¶ 11} The issue before us is the meaning of the term "business" as used in the subject homeowner's insurance policy, a copy of which is in the record. It is undisputed the defendants were the insureds under the homeowner's insurance policy with appellee in effect from September 11, 2016, to September 11, 2017. As stated in Section II(2)(a)(11) of the policy's "Insuring Agreement," excluded from personal liability coverage are medical payments to others for "**bodily injury** * * * because of or arising out of a **business** owned or financially controlled by an **insured** * * *. This exclusion

5.

does not apply to activities of an **insured** ordinarily incident to nonbusiness pursuits." (Emphasis sic.)

{¶ 12} Appellee's motion for summary judgment arose from its complaint for declaratory judgment. We review de novo a trial court's ruling on a question of law in a declaratory-judgment action. *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 13 ("Today, we reiterate that the abuse-of-discretion standard applies to the review of a trial court's holding regarding justiciability; once a trial court determines that a matter is appropriate for declaratory judgment, its holdings regarding questions of law are reviewed on a de novo basis.")

{¶ 13} We review as a matter of law the interpretation of an insurance policy. *Sauer v. Crews*, 140 Ohio St.3d 314, 2014-Ohio-3655, 18 N.E.3d 410, ¶ 10. We apply a de novo standard of review to a question of law. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4.

{¶ 14} "It is well settled that 'insurance policies should be enforced in accordance with their terms as are other written contracts. Where the provisions of the policy are clear and unambiguous, courts cannot enlarge the contract by implication so as to embrace an object distinct from that originally contemplated by the parties.'" *Id.* at ¶ 8, quoting *Rhoades v. Equitable Life Assur. Soc. of U. S.*, 54 Ohio St.2d 45, 47, 374 N.E.2d 643 (1978). "As we examine the contract as whole, we presume that the parties' intent is reflected in the language used. When the policy language is clear, the court may look no

6.

further to find the intent of the parties." *Houston v. Liberty Mut. Fire Ins. Co.*, 6th Dist. Lucas No. L-04-1161, 2005-Ohio-4177, ¶ 36.

{¶ 15} "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. "If a reasonable interpretation of the language exists, then we should give the agreement its intended legal effect." *Laboy v. Grange Indemn. Ins. Co.*, 144 Ohio St.3d 234, 2015-Ohio-3308, 41 N.E.3d 1224, ¶ 10.

{¶ 16} "'[A]n exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded.'" (Emphasis sic.) *Sauer* at ¶ 11, quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (1992). Courts are commanded to refrain from inserting or deleting words to a contract while also giving effect to the words used, which we cannot pretend do not exist or have no meaning. *Cleveland Elec. Illum. Co. v. City of Cleveland*, 37 Ohio St.3d 50, 524 N.E.2d 441 (1988).

> An insured gets the coverage he pays for, and, if the coverage is to be increased beyond that which he needs or for which the policy provides, the premiums will necessarily be increased. Therefore, the plaintiff who is not a party to the contract is not in a position to urge a construction of the contract which would be detrimental to both parties to the contract.

*Cook v. Kozell*, 176 Ohio St. 332, 336, 199 N.E.2d 566 (1964).

7.

{¶ 17} Appellee supported its motion for summary judgment with evidence in the record. First, appellee pointed to the insurance policy in effect at the time of the infant's death between appellee and the "insured," the defendants. Appellee argued the policy is clear and unambiguous. The Definition section at 3 of the policy defined "home day care services provided by an insured" to non-relatives on a scheduled basis [is] a business. Section II(2)(b) of the insurance policy precluded personal liability coverage "(1) to liability assumed under: (a) any oral contract or agreement; or (b) any contract or agreement: 1) in connection with any **business** of an **insured** * * *." (Emphasis sic.) Section II(2)(a)(11) of the insurance policy excluded coverage for personal liability and medical payments to others for "**bodily injury** * * * because of or arising out of a **business** owned or financially controlled by an **insured** * * *." (Emphasis sic.)

{¶ 18} Second, appellee pointed to Mr. Meyers' deposition, which is in the record. He testified that Mrs. Meyers watched children for pay at their home without either of them notifying appellee, which was required by the policy. Due to that lack of notice, appellee argued, "As the Meyers themselves do not dispute, neither they nor Auto-Owners ever contemplated there being liability coverage for home day care services provided to non-relatives on a scheduled basis should a liability claim be presented. Auto-Owners did not charge a premium for such an exposure and there is no evidence the Meyers paid one."

{¶ 19} Third, appellee pointed to Mrs. Meyers' deposition, which is in the record. Mrs. Meyers testified she cared for children in her home for 15 years. She did not

8.

consider it a leisure activity, but she did not call it a "business."  Rather, she testified as follows:

Q:  What do you call it then if it's not a business?

* * *

A:  I would – in my opinion it's just something I do to, while I stay at home to help family and friends out.  It's a way for me to be able to stay home with my kids, kind of make me feel more productive than just staying at home.

Q:  But you also agree that you charged for it?

A:  Correct.

Q:  And you got paid for it?

A:  Correct.

Q:  What do you want me to understand your testimony to be today as to what your occupation was on the date of this loss?  What do you say was your occupation?

A:  I was – whenever anybody asked me, I would say I'm a stay-at-home mom and I also care for children.

Q:  Others' children?

A:  Yes.

Q:  So sort of a dual occupation?

A:  Yes.

Q: Stay-at-home mom and watching others' children in your home?

A: Right.

Q: For pay?

A: Correct.

{¶ 20} Mrs. Meyers testified she was aware appellants' original April 27, 2017 complaint against the defendants alleged she "ran an unlicensed and unincorporated babysitting business out of their home." The record shows that subsequent to her deposition appellants amended their complaint to allege she "watched and/or cared for children unrelated to them as a hobby out of their home."

{¶ 21} Coinciding with the insurance policy period, the record includes a list Mrs. Meyers prepared of ten families, with 14 children, she regularly cared for in her home in 2016 for pay. Each child and family was unrelated to the defendants. On the date of the incident in her home, Mrs. Meyers testified she was caring for the defendant's infant, plus three other children under the age of four, and her own daughter. Her regular child care hours were weekdays from 6:15 a.m. to 4:30 p.m. Her schedule with these families ranged from every weekday to certain regular weekdays to essentially being on call for whenever the family required babysitting, and this schedule was why she charged a daily rate rather than a weekly or monthly rate and why she did not have families sign a formal contract. She reached schedule understandings with families through text messages and verbal discussions. Her regular rate of pay was $20 per day for a child who is not yet potty-trained, and $18 per day for a potty-trained child.

10.

{¶ 22} She did not formally advertise her services, relying on referrals and word-of-mouth: "Just people I knew. I only wanted families, people that I knew and trusted."

Q: Why did you say yes when [the appellants] asked?

A: I really liked – [appellant-father's sister] was always a good friend of mine and I always liked [appellant-mother], and I was excited about having another baby. I didn't have any small babies and I love having a baby.

{¶ 23} Her schedule with defendants was to watch their infant on Wednesdays and Fridays from 7:00 or 7:15 a.m. to 4:00 or 4:30 p.m. for $20 each day. Her services actually began on Tuesday, December 6, 2016, and continued on Thursday, December 8, Wednesday, December 14, Friday, December 16, and ended on Wednesday, December 21, the date of the incident. Appellant-mother paid Mrs. Meyers on Fridays for the week's services. The schedule was established through verbal discussions and text messages between Mrs. Meyers and appellant-mother.

{¶ 24} The child care income was Mrs. Meyers' only income, but she did not consider it was worth reporting for tax purposes. She used the money she earned to pay for household living expenses. As of August 2018, when all of her own children were in school all day, Mrs. Meyers continued to babysit in her home for pay, but solely on an on-call basis for friends and family. She testified, "I've always only wanted to stay home while my kids were at home."

{¶ 25} Fourth, appellee pointed to appellant-mother's deposition, which is in the record. Appellant-mother testified she learned from her sister of Mrs. Meyers' child care service. Mrs. Meyers cared for appellant-mother's nephew beginning at eight-weeks for about six months. Appellants confirmed they are not relatives of the defendants. Appellant-mother confirmed the schedule with Mrs. Meyer was to watch the 10-week-old infant on Wednesdays and Fridays from 7:15 a.m. to 4:30 p.m. for $20 each day, payable every Friday. Appellant-mother's sister would watch the child the other three days.

{¶ 26} Appellant-mother testified that she understood Mrs. Meyers "had a business of babysitting young kids." When dropping off her infant, she recalled seeing other children in Mrs. Meyers' home who she knew were not relatives and whose parents were also paying Mrs. Meyers to care for their children.

Q: Tell me about your basis for your belief that it was a business.

A: She's been doing it for a few years. I know people that took their kids there. Like my nephew, he went there. My sister informed me about the babysitting and recommended her.

Q: Okay. So if I understand you correctly, your opinion that it was a business was based on the fact that you and possibly others were taking children there to be babysat and you were paying for the service?

A: Correct.

{¶ 27} Appellants opposed summary judgment by solely pointing to Mrs. Meyers' deposition. In Mrs. Meyers' opinion, she did not operate a business because she did not

advertise her services, did not contract with any parents for her services, and only watched children for family and friends, mostly on an infrequent and irregular basis for the past 15 years. Appellants argued that Mrs. Meyers "is not even sure she makes any money doing so as she may be compensated by her family and friends with cookies, small gifts and/or by being given around $2.00 an hour for her time, energy and expenses." Appellants argued Mrs. Meyers' testimony created a material question of fact because home day care services provided by the insured on an infrequent and irregular basis is not a business.

{¶ 28} On de novo review we find the provisions of the subject insurance policy are clear and unambiguous regarding the meaning of "business" relevant to this appeal. As stated in the Definitions Section of the policy's "Insuring Agreement,"

> To understand this policy, you must understand the meaning of the following words. * * * (2) **Bodily injury** means physical injury, sickness or disease sustained by a person including resulting death of that person. * * * (3) **Business** means * * * (b) home day care services provided by an **insured** * * *." (Emphasis sic.)

At this juncture, the reasonable meaning of "home day care services" in the subject homeowners' insurance policy is Mrs. Meyers' day care for another, presumably children, other than her own family, in her home during the day. According to the record, Mrs. Meyers' activities in the home aligned with that reasonable meaning of "home day care," and the policy did not provide coverage for that "business" activity.

13.

{¶ 29} Even if the reasonable meaning of "home day care services" did not apply, the policy then clearly and unambiguously defines in the Definitions Section at paragraph (3) of the policy's "Insuring Agreement" four exceptions to a "business" activity under which the policy would provide coverage: "**Business** does not include: (a) home day care services: (1) any insured provides on an infrequent and irregular basis; (2) provided part time by a relative who is under 21 years of age; (3) provided to a relative by any insured; nor (4) provided on a mutual exchange basis." (Emphasis sic.)

{¶ 30} On de novo review of the record, we find Mrs. Meyers' activity in the home did not meet the foregoing four exceptions to avoid being a "business" under the insurance policy. *See State Farm Fire & Cas. Co. v. Straw*, 9th Dist. Medina No. 2849-M, 2000 WL 141077, *2-3 (Feb. 2, 2000). We find that Mrs. Meyers alone frequently and regularly offered in-home child care services for 15 years, including the policy term, often to friends who were not relatives, and always for pay or some sort of compensation expectation, such as gifts, from them. Her expected daily pay rate depended on whether or not the child was potty-trained. She routinely offered her services Monday through Friday between 6:15 a.m. (or earlier) and 4:30 p.m., and some families used her maximum schedule.

{¶ 31} Specific to the present case, we find the provisions of the subject insurance policy are clear and unambiguous that Mrs. Meyers' in-home child care was a "business" that excluded coverage for appellants' claims. We find Mrs. Meyers reached an agreement primarily through text messages with the appellant-mother to care for the

14.

infant on Wednesdays and Fridays from 7:00 or 7:15 a.m. to 4:00 or 4:30 p.m. for $20 each day. Her services began on Tuesday, December 6, 2016, and continued for three weeks until the date of the incident. Appellant-mother paid Mrs. Meyers on Fridays for that week's child care services, including services on the incident date. Appellants and defendants are not related to each other. The incident occurred in Mrs. Meyers' home. The differing opinions between Mrs. Meyers and the appellant-mother as to whether or not Mrs. Meyers operated a child care business out of her home do not create material issues of fact where the underlying facts about Mrs. Meyers' child care activities are undisputed.

{¶ 32} A survey of Ohio courts facing a similar task to interpret the "home day care services" exception to a homeowner's insurance policy coverage exclusion for a "business" activity yields the same consistent outcome: "home day care services" are a "business."

{¶ 33} The First District Court of Appeals interpreted a policy with similar language to the present case: "If an insured regularly provides home day care services to a person or persons other than insureds and receives monetary or other compensation for such services, that enterprise is a business." *W. Am. Ins. Co. v. Sluder*, 119 Ohio App.3d 211, 214, 695 N.E.2d 7 (1st Dist.1997). The appeals court found the "language of this policy is not ambiguous." *Id.* at 215. "There is no question [the babysitter] was running a business, as defined in the policy. She was clearly conducting activities on a regular basis for the purpose of earning some additional income. That has generally been held to

15.

be a business pursuit." *Id.*, citing *Watkins v. Brown*, 97 Ohio App.3d 160, 166, 646 N.E.2d 485 (2d Dist.1994) (business pursuit exclusion clause applied to regular babysitting activity and income earned by it, irrespective of the primary motive for engagement) and *Lenart v. Doversberger*, 8th Dist. Cuyahoga No. 65372, 1994 WL 189433, *7 (May 12, 1994) (a collateral business pursuit primarily pursued for purposes other than pecuniary gain are nonetheless a business). However, under the facts of that case, insurance coverage was available because the child's injuries occurred outside of the insured's "business": after the day's paid care ended and during a routine time of personal accommodation or friendship for the child's mother at no charge. *Sluder* at 216.

{¶ 34} As cited by the appellate court in *Sluder*, the Second District Court of Appeals determined "business" as defined in the subject policy "adequately describes" the insured's babysitting activities. *Watkins*, at 164. The court reasoned:

> [The insured] and the [plaintiffs] negotiated a fee for [the insured's] babysitting services to compensate her for her time and trouble. This amount, $40, was paid in cash each Friday, and was not used to purchase food or diapers or any other supplies for [the child]. The fact that [the insured] did not realize an enormous profit from this arrangement is not dispositive, nor is the fact that she probably would not have agreed to babysit if someone other than her good friend had asked her to do it. The definition of "trade" does not require that the tradesperson be motivated entirely by profit, and the $40 she realized each week was pure

profit -- gain produced by her labor. Moreover, her labor was regular -- each weekday from 9:00 to 4:00 or from 12:00 to 4:00 -- though it lasted for only about six months. [The insured's] babysitting of [the child] was work she engaged in regularly, and which produced an income for her. It was therefore a business as contemplated in the homeowner's policy.

*Id.* at 165-66.

{¶ 35} The Eleventh District Court of Appeals also interpreted that the exception to insurance policy coverage language "arising out of business pursuits of an insured" applied to the insured's in-home day care service where a child was bitten by the insured's dog. *Titterington, By & Through Guardians Titterington v. Portman*, 11th Dist. Geauga No. 93-G-1803, 1994 WL 587514, *2 (Aug. 12, 1994). The court reasoned, "[The insured] was paid for watching [the child] as well as the other unrelated child. [The insured] advertised her service on two occasions in a local newspaper and bought child care related items, including two cribs, three high chairs, mattresses, additional blankets and bedding." *Id.* at *1. "[I]t becomes clear that babysitting is a business pursuit, and that the trial court did not err in so holding." *Titterington v. Portman*, 11th Dist. Geauga No. 95-G-1933, 1996 WL 200597, *2 (Mar. 29, 1996).

{¶ 36} The Eighth District Court of Appeals interpreted an exception to a homeowner's insurance policy coverage exclusion "arising out of the past or present business pursuits of an insured person" applied to the insured's in-home babysitting for a child when the child was injured. *Allstate Ins. Co. v. Vasquez*, 74 Ohio App.3d 564, 567,

17.

599 N.E.2d 756 (8th Dist.1991). The court found the policy language to be clear and unambiguous: "Even the most unsophisticated layman can read the policy exclusions and conclude that a babysitting business or any business conducted in the home was not covered by the Allstate policy." *Id.*

{¶ 37} This court also interpreted an exception to a homeowner's insurance policy coverage exclusion for "business pursuits" and confirmed the policy precluded coverage. *Am. Family Ins. v. Phillips*, 2017-Ohio-8670, 100 N.E.3d 947, ¶ 40 (6th Dist.). We found that the insured under a homeowner's insurance policy was engaged in a business pursuit when he agreed to do for a neighbor what he had done many times in the past: for $3,000, dig a hole, take down a barn, burn a barn, and cover the hole with rocks. *Id.* at ¶ 23. Unfortunately, the neighbor's property sustained losses after the insured left the site without first properly extinguishing the fire. We adopted a two-part test to determine a "business pursuit" as used to exclude coverage under the policy: (1) continuity, meaning a customary engagement or a stated occupation, and (2) profit motive, meaning the activity performed is a means of livelihood, gainful employment, earning a living, procuring subsistence or profit, commercial transactions or engagements. *Id.* at ¶ 17, citing *Lenart*, 8th Dist. Cuyahoga No. 65372, 1994 WL 189433 at *7; *Byers v. Motorists Ins. Cos.*, 169 Ohio App.3d 404, 2006-Ohio-5983, 863 N.E.2d 196, ¶ 10 (4th Dist.). In reaching our decision, we found actual profit is not required to be an immediate or a primary consideration of a "business pursuit." *Phillips* at ¶ 35. "'The business need not be the insured's principal occupation. * * * The insured's involvement with the activity,

18.

however, should be more than minimal (footnotes omitted)." *Byers* at ¶ 10, quoting

Alan D. Windt, *Insurance Claims and Disputes*, Section 11.15, 286-287 (3d Ed.1995).

{¶ 38} We conducted a de novo review of the record using the well-established standards under Civ.R. 56 and find there remain no genuine issues of material fact and, after construing all the evidence most strongly in favor of appellants, reasonable minds can come to but one conclusion that appellee is entitled to summary judgment as a matter of law that the subject homeowner's insurance policy does not provide personal liability coverage to defendants for appellants' claims.

{¶ 39} The undisputed facts lead us to determine that Mrs. Meyers ran a business out of her home, which intentionally precluded coverage under her homeowner's insurance policy. Although Mrs. Meyers did not formally advertise her in-home child care services, she relied on referrals and word-of-mouth to reach friends and family. Mrs. Meyers regularly cared for children in her home for 15 years, including during the policy term, and had child care items in her home, such as a Pack'n Play, to support her child care services. By caring for at least ten children in 2016 alone, Mrs. Meyers' in-home child care services were more than minimal. She was paid money or otherwise compensated for her services. The money Mrs. Meyers earned from her in-home child care services supported living expenses and other household needs.

{¶ 40} Mrs. Meyers only commenced care for the appellants' infant after establishing a business relationship with appellant-mother. They reached an understanding for child care two days per week for set hours, and that schedule, which

19.

lasted three weeks, was expected to continue had the unfortunate event of the infant's death not occurred. Mrs. Meyers expected payment from appellant-mother at her regular daily rate for infant care, and she received payment weekly. Appellant-mother supplied the breast milk, supplemental formula, bottles, and diapers for her infant, and Mrs. Meyers did not incur out-of-pocket expenses for the infant's care.

{¶ 41} Appellants' sole assignment of error is not well-taken.

### III. Conclusion

{¶ 42} On consideration whereof, the judgments of the Williams County Court of Common Pleas are affirmed. Appellants are jointly ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.
_____
JUDGE
Christine E. Mayle, J.

Gene A. Zmuda, P.J.
CONCUR.
_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.